[Crim. No. 6838. Second Dist., Div. Two. Feb. 18, 1960.]

THE PEOPLE, Respondent, v. JAMES ROSBOROUGH, JR., Appellant.

Umann & Marks for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

ASHBURN, J.—Convicted of forgery of an endorsement of a certain check (Pen. Code, § 470),[1] defendant was granted probation and now appeals from the judgment (per Pen. Code, § 1237, subd. 1), and from the order denying his motion for new trial.

Counsel advance three points for reversal, (1) failure to establish a corpus delicti at the preliminary hearing, (2) failure to establish a corpus delicti at the trial in the superior court, (3) insufficiency of the evidence to sustain the finding of guilt.

It is conceded that appellant passed as genuine a check bearing a forged endorsement and that intent to defraud would follow from proof that he knew that endorsement to be forged. In their reply brief counsel say: "Respondent concedes the three elements of uttering or passing a bad check as being (1) It must be passed as true and genuine, (2) It must be known by the other to be false, and (3) There must be an intent to defraud someone.

"Appellant concedes to Respondent's quite logical argument that if element two is satified, then the third element would be satisfied *a posteriori*.

"Respondent's brief indicates that there is some question as to the use by Appellant of the words 'corpus delicti,' and, in this connection Appellant to clarify any misunderstanding does use it as synonymous with 'sufficiency of the evidence.' The main problem can thus be resolved to whether or not there was sufficient evidence to show, circumstantially or directly, that at the time the check was uttered it was known by the utterer (defendant) to be false." The appeal thus reduces itself to a question of whether the evidence is sufficient to support the implied finding of guilty knowledge which was made by the trial judge after a nonjury trial.

In passing upon this question certain basic rules of review must be kept in mind. " 'We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the inno-

---

[1] " 'The crime of forgery consists either in the false making or alteration of a document without authority or the uttering (making use) of such a document with the intent to defraud.' " (*People* v. *Chapman,* 156 Cal.App.2d 151, 156 [319 P.2d 8].)

cence of the defendant will not warrant interference with the determination of the jury.'' (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].) ██ ''Even testimony which is subject to justifiable suspicion does not justify a reversal of a judgment, for it is the exclusive province of the jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'' (*People* v. *Carlson*, 73 Cal.App.2d 933, 940 [167 P.2d 812].) ██ The rule is equally applicable to issues (such as defendant's guilty knowledge) whose solution depends upon circumstantial evidence, for the question whether those circumstances are equally consistent with innocence is one of fact for the jury except in those instances where the court can say as matter of law that there is no substantial evidence to support a finding against the defendant upon the particular issue. (*People* v. *Wales*, 136 Cal.App.2d 846, 852 [289 P.2d 305]; *People* v. *Newland, supra,* 15 Cal.2d 678, 680-681; *People* v. *Perkins*, 8 Cal.2d 502, 509 [66 P.2d 631]; *People* v. *Daugherty*, 40 Cal.2d 876, 885 [256 P.2d 911]; 19 Cal. Jur.2d, § 485, at p. 251.) ██ It is true in criminal as well as civil cases that the court is not bound to accept testimony of the appellant which is not actually convincing even though it be uncontradicted. ''It must be considered in connection with other testimony and reasonable inferences therefrom, and the rule that the jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.'' (*Nevarov* v. *Caldwell*, 161 Cal.App.2d 762, 777 [327 P.2d 111].) ██ ''The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt.'' (*People* v. *Daugherty, supra,* 40 Cal.2d 876, 885.) See also *People* v. *Poindexter*, 51 Cal.2d 142, 148 [330 P.2d 763].

The following statement of facts is based therefore upon those portions of prosecution evidence, statements and conduct and testimony of defendant, testimony of defendant's witnesses, documentary evidence and inferences reasonably drawn which are adverse to appellant's contentions.

██ On January 19, 1959, defendant was the first customer in the Sunset and Stanley Branch of Security-First National Bank in Los Angeles. He had no commercial account there but did have a savings account with a balance of One

Dollar in it. He presented to the manager, Mr. Cowling, a check for $3,534.89, dated January 15, 1959, made by William Morris Agency, Inc., payable to Leslie Stevens and drawn upon the Beverly-Wilshire Branch of Bank of America in Beverly Hills. On the back it bore a purported endorsement of Leslie Stevens and that of defendant who used the name Santiago De Santiago. His real name is James Rosborough De Santiago, Jr. It was stipulated that he was also known as James De Santiago; he also used the name Santiago De Santiago, Jr. at times. He testified that his father was an English Negro and his mother a French Negro. The purported signature of Leslie Stevens had been forged by someone. It was followed by the name Santiago De Santiago in defendant's handwriting. He told Mr. Cowling that he had a savings account which was inactive, he had lost the book and he requested a new one which was issued to him in the name Santiago De Santiago. Defendant said he had sold some Hi-Fi record albums and wanted the money in a savings account "so he could hold on to it." Mr. Cowling or Mr. Hale, assistant manager, approved the deposit for immediate credit. This was a few minutes after 10 a.m. Between 12:30 and 1 p.m. of the same day, while Mr. Cowling was out for lunch, defendant presented to teller Nancy Adelson a withdrawal slip for $2,500, saying that the minute he got money something always happened and he had to spend it, had to buy a new car. Mr. Hale okayed the withdrawal, after having verified the sufficiency of the maker's funds to pay the William Morris Agency check, and Miss Adelson delivered the $2,500 to defendant in large bills. Seven days later defendant withdrew $500 from the savings account. Out of these funds and about four days after withdrawal of the $2,500 defendant used $388 as a deposit on a Volkswagon automobile, paid delinquent rent of $115 and some other bills; he had on his person at the time of arrest on February 5, 1959, the sum of $577. Apparently he also used $500 to buy an interest in a dress shop. What became of the balance of the money does not appear.

The background to the forgery is this. Leslie Stevens, a dramatist, received from the William Morris Agency a royalty check for $3,534.89 and on January 16, 1959, went to the Laurel and Sunset Branch of Bank of America to deposit it. Arriving at about 11 a.m. he made out a deposit slip and in doing so "took the check out to look at the amount"; he then got into a line at the teller's window and there realized

he had left the check on the table with the pens; he went back to get it but it was gone. He had not endorsed the check or authorized anyone to do so. He looked over the people in the bank, some 15 to 20 of them (not seeing defendant, however), looked in the waste basket and saw it was not there, went to the manager and asked him to have payment stopped; he was assured that this would be done. Through some error that did not occur before the check was paid.

On January 28, Mr. Cowling and Mr. Hale called on defendant at his residence, told him there was a discrepancy in the signatures on the check, that it was claimed the first endorsement had been forged and that the bank would look to him for repayment. Defendant seemed upset and claimed that he was the injured party as he had given value for the check, had sold a Picasso painting and some other objects of art; that he had no knowledge of any forgery. To the police at the time of his arrest he said he got the check from a woman he knew as "Les," whose husband was Major Goldstein or Goodstein; they were at his house and he sold to them for $3,500 a record collection, some statues, some books and an original Picasso painted on a napkin and appraised at $2,000. "Les gave me the check and endorsed her name on it and I have her back $43.00 and some cents in change. I thought she was an actress, when I saw the check was from William Morris Agency. I took the check and deposited it in my account at Security Bank. The same day I went back to the bank and withdrew $2,500.00 in cash. A few days later I drew out another $500.00. I used the money to buy a car, pay the dentist and pay other bills."

In brief, the following is the substance of his testimony at the trial where it developed, however, that the story was one which the court well might have rejected as preposterous. It ran as follows. Defendant had met Mr. Goldstein at the bar of the Garden of Allah in June, 1958, and had seen him three or four times a week at the bar or the pool; never was sure whether the last name was Goodstein or Goldstein. This man introduced defendant to one "Les" as his wife and defendant assumed her name would be Goldstein. Though they professed to be husband and wife defendant soon learned that she lived at the Roosevelt Hotel in Hollywood and he had an apartment elsewhere. Defendant's impression was that "she was an actress or model in connection with show business or a dancer or something of that sort." Several times he had seen her have a script with her and something was mentioned about

her doing a play. On the evening of Saturday, January 17th, when ''the Goldsteins'' were at defendant's apartment and the alleged sale was made, Mr. Goldstein had the check in his billfold and gave it to his wife to endorse. She wrote the name ''Leslie Stevens'' on the back and defendant accepted it without any request for identification, any question or comment, merely assuming that, as it was from the William Morris Agency, she was an actress and Les Stevens her professional name. (Defendant had introduced the couple to his neighbor, Kenney, as Bob and Les Goldstein.) This was on Saturday night, the 17th, and the depositing of the check was on Monday, the 19th, just as soon as the bank opened. Defendant saw Mr. Goldstein but twice after the check transaction, ''pulling out of the Garden of Allah'' and has not ''the faintest idea'' where he now lives. The wife did not appear at the trial and the record discloses no information concerning her whereabouts. Defendant told the arresting officer he had no idea where either of them could be found. This story well might have been rejected by the trial judge as a fabrication. But there was much more pointing to the same conclusion.

██ Mere possession of a forged instrument is a circumstance affording some evidence of knowledge of its spurious nature. (*People* v. *Pounds,* 168 Cal.App.2d 756, 759 [336 P.2d 219].) It is analogous to possession of stolen property which of itself will not prove a theft but ''such possession plus 'slight corroborative evidence of other inculpatory circumstances' will suffice.'' (See *People* v. *Russo,* 168 Cal. App.2d 747, 749 [336 P.2d 628].) ██ Presentation of the instrument for encashment is a representation of its genuineness. (*People* v. *Chapman,* 156 Cal.App.2d 151, 156 [319 P.2d 8].)

██ There is at bar ample evidence of motive for defendant to forge the endorsement or to negotiate it with knowledge of the forgery thereof. Primarily it was need and want of money. ██ While it is not essential to prove motive in a criminal case it is always proper and persuasive to present the fact of motive for the crime. (Fricke on California Criminal Law (5th ed.), p. 24; *People* v. *Northcott,* 209 Cal. 639, 644 [289 P. 634, 70 A.L.R. 806] ; 14 Cal.Jur.2d, § 89, p. 280.)

██ Prior to the date of the crime defendant had been living on unemployment benefits, receiving $37 weekly checks; during 1958 he was not working until November when he was employed as a bartender, his present vocation. He was

falling behind on his rent and other bills. The One Dollar savings account had been opened at Security-First National Bank in May, 1956, with a deposit of that amount and no additional sums had been added. A special checking account and a commercial account in said bank had existed from January, 1956, to February, 1958, and the highest balance in the account was $101.85. Between 1956 and the time of trial defendant had no account in any other bank. He lived in a small apartment in an old frame house on a hillside on Laurel Canyon Boulevard; the furnishings were decrepit, consisting, according to Mr. Cowling's testimony, of a straw rug, a bookcase made of planks and building blocks, an old scarred desk, a day bed in poor condition and "various things which I [counsel for defendant] call objects de art, art objects, little statuettes, numerous books," presenting on the whole "a Spartan atmosphere." On the Friday immediately preceding the alleged sale to the Goldsteins the universal joint had dropped out of defendant's 1940 Chevrolet Coupe and he needed or wanted a new car. Without visible means of support or of acquiring a new car or otherwise pulling himself out of debt, appellant had an obviously strong motive for committing the crime with which he was later charged.

Defendant's own testimony and conduct presented numerous inconsistencies which cast grave doubt upon his story which in itself seems inherently improbable. He claims to have sold to the Goldsteins for $3,500 numerous objects of art, collector's items. No cultural background is hinted in the evidence. The objects d'art proved to be 27 old jazz records, claimed to be valuable because they were original pressings which had never been repressed, some prints and books on the theater and some on philosophy and a few occults, such as Yoga, Buddha and things of that sort, and four pre-Columbian statutes. "Some of the books, Million and One Nights, Volume, two volumes on Cinema, and Garbo, and the Night Watchman; and there was a motion picture encyclopedia; and Spirit of the Cinema; and there was a film year book, which was about a dozen of them which they were sold at that time for a dollar a piece when they were first printed." One of the principal items of the sale was a painting upon a napkin bearing the name of Picasso, which had been sent through the mail from Algiers to appellant as a Christmas present by some former neighbors named Romano. Defendant told Officer Northrup it had been appraised at $2,000; but he had actually received, previous to the sale, a letter from the owner of Now Gallery

saying that the sketch if a genuine Picasso would be worth that sum. Defendant told Goldstein at the time of sale that he was not sure of its authenticity. Here the $2,000 value drops out of the deal.

Though defendant told the bank teller when he drew the $2,500 that something always happened the minute he got money and that he had to buy a new car, and though he was behind on his rent and dentist's and other bills, he acquired, so he said, an interest in a dress shop about the 1st of February, 1959, for $500, paying for same out of money he had been saving while on relief; indeed he had accumulated $750 in cash before January 19th and had it in his home. So he did not need the $2,500 on the 19th in order to make a down payment of $388 on the Volkswagon.

On one of his signature cards (dated 5/7/56) at the Security Bank defendant wrote his mother's maiden name as M. Roseborough; another (1/16/56) gave it as Miss Margerete DeFran, but the name actually was Marguerite DeFraiser; on cross-examination he was unable to explain these departures from fact.

Appellant's counsel would cancel out all these suspicious and persuasive circumstances through application of the principle that circumstantial evidence in a criminal case must be inconsistent with any rational or reasonable theory of innocence in order to warrant a conviction or an adverse finding upon a particular issue. But that question, like reasonable doubt (*People* v. *Daugherty, supra,* 40 Cal.2d 876, 885) is one of fact for the jury or other trier of fact (see *People* v. *Wales,* and other authorities cited *supra.*) It is only where the reviewing court as a matter of law concludes that there is no substantial direct or circumstantial evidence that defendant has committed the alleged crime that the court can take the issue away from the jury. By the same token the appellate court cannot substitute its finding for that of the trial judge when supported by substantial evidence of any kind.

We cannot say that the evidence in this case does not support the implied finding of the trial court that defendant was guilty of knowingly and wilfully uttering a forged instrument.

Appellant asks for an augmentation of the record through inclusion of the transcript of the preliminary hearing before the magistrate and the record of the hearing upon his motion in the superior court to set aside the information under

section 995, Penal Code. A request that these matters be included in the transcript on this appeal was made in the trial court and denied. Appellant did not pursue the remedy of prohibition provided by section 999a, Penal Code.[2] He waited until after conviction and then sought for the first time to review the order and to do so upon this appeal.

Respondent contends that the remedy provided by section 999a is exclusive. We are unable to agree. An order holding defendant to answer in the superior court is without jurisdiction and hence void if based upon no substantial evidence whatever. Where the order is not supported by some evidence a writ of prohibition will issue regardless of Penal Code, section 999a. (*Greenberg* v. *Superior Court,* 19 Cal.2d 319, 323 [121 P.2d 713].) And an erroneous decision of the trial court that there is substantial evidence and that it has jurisdiction to proceed with the trial does not cure the jurisdictional defect. (*Harden* v. *Superior Court,* 44 Cal.2d 630, 634 [284 P.2d 9] ; *Parks* v. *Superior Court,* 38 Cal.2d 609, 615 [241 P.2d 521] ; *Rescue Army* v. *Municipal Court,* 28 Cal.2d 460, 465 [171 P.2d 8].) But if there is some substantial evidence to support all essential elements of the alleged crime the superior court or the reviewing court will not inquire into its sufficiency. (*Greenberg* v. *Superior Court, supra,* p. 322; *Davis* v. *Superior Court,* 78 Cal.App.2d 25, 27 [177 P.2d 314] ; *McFarland* v. *Superior Court,* 88 Cal.App.2d 153, 159 [198 P.2d 318].) As the question is strictly one of jurisdiction in the fundamental sense of a right to hear and determine, it may be raised at any time and according to settled principles is not waived because not mentioned at an early stage of the case.

It was ruled in *Nelson* v. *Superior Court,* 77 Cal. App.2d 783, 785 [176 P.2d 390] (decided in 1947, before enactment of § 999a) that the question of the existence of substantial evidence before the magistrate may be raised and reviewed upon an appeal from the judgment. Likewise, the recent case of *People* v. *Fernandez,* 172 Cal.App.2d 747, 750-751 [342 P.2d 309], makes the same holding and hearing

---

[2]Pen. Code, § 999a: ''A petition for a writ of prohibition, predicated upon the ground that the indictment was found without reasonable or probable cause or that the defendant had been committed on an information without reasonable or probable cause, must be filed in the appellate court within 15 days after a motion made under Section 995 of this code to set aside the indictment on the ground that the defendant has been indicted without reasonable or probable cause or that the defendant had been committed on an information without reasonable or probable cause, has been denied by the trial court. . . .''

in the Supreme Court was denied. Such was assumed to be the law in *People* v. *Rebolledo,* 93 Cal.App.2d 261, 264 [209 P.2d 16]; *People* v. *Costa,* 141 Cal.App.2d 795, 798 [297 P.2d 667]; *People* v. *Duncan,* 50 Cal.App.2d 184, 188 [122 P.2d 587]. The second footnote on page 751 of the Fernandez case, *supra,* says: "Without considering the applicability of prohibition or habeas corpus, it is clear that they would not be exclusive remedies." ▮ We accept this as the prevailing law and grant the motion for augmentation to the extent of including in this record the transcript of the preliminary hearing, but not the record of the hearing in the superior court upon the motion made under section 995, Penal Code, to set aside the information. Appellant's specific point is that there is no evidence that he had knowledge of the spurious nature of the endorsement. Examination of the transcript discloses circumstantial evidence sufficient to warrant the inference of knowledge and to fulfill the measure of "reasonable or probable cause" which "means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." (*People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344].) Thus there is established the presence of jurisdiction in both lower courts and the augmentation does not improve appellant's position in any manner or degree.

The motion for augmentation of the record is granted in part as aforesaid. The judgment and order denying motion for new trial are affirmed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied March 10, 1960. The petitions of appellant and of respondent for a hearing by the Supreme Court were denied April 13, 1960. Peters, J., was of the opinion that the petitions should be granted.