[Crim. No. 5605. Third Dist. Feb. 16, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTINE MALICH, Defendant and Appellant.

**Counsel**

John R. Griffin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Roger E. Venturi, Russell L. Moore, Jr., and Charles P. Just, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**FRIEDMAN, Acting P. J.**—A jury trial resulted in Christine Malich's conviction of four counts of armed robbery. She appeals from the judg-

ment. We summarize the prosecution evidence describing the four offenses:

*Count I: Coral Reef Lodge—Eugenia Owens.*

Eugenia Owens was employed by the Coral Reef Lodge, in the unincorporated area of Sacramento County. On the evening of June 6, 1969, Mrs. Owens heard the call bell in the lobby and entered the lobby to respond. Three persons, a man and two women, were in the lobby and inquired about sleeping accommodations. When Mrs. Owens looked up from the desk, the older woman, identified as defendant, was holding a small blue revolver and ordered her to give them all the cash. When Mrs. Owens demurred, defendant told her to comply or she would put a bullet through her heart. After gathering up the money ($418), defendant told the man, identified as Fred West, to get the car. Just after the three robbers left, Mrs. Owens went to the window and saw the car, which bore a license number RAF 984 or RXF 984. She went next door to the coffee shop and reported the incident to two sheriff's deputies who were there.

*Count II: Residence of Anthony and Frances Gaffke.*

The Gaffkes lived in the unincorporated area of Sacramento County. On June 11, 1969, at about 8:30 or 9 p.m., Mrs. Gaffke opened the door in response to a knock. Two men and two women were outside and asked for Tony, which was a name borne both by Mr. Gaffke and his son. They entered the Gaffke's home without invitation. One of the women held a small black revolver and one of the men also had a gun. The woman with the gun wore high-piled blonde hair. Both Gaffkes identified defendant as the woman with the gun. The Gaffkes were first herded into a bedroom. Mr. Gaffke was then ordered to show them the safe. The two men took him into another room while defendant and her daughter stayed behind and bound Mrs. Gaffke. The robbers took two rifles, a .38 automatic pistol, a coin collection with a face value of $1,400 and Mrs. Gaffke's rings.

*Count III: Apartment of Helen Thomason.*

Mrs. Thomason managed an apartment complex in the City of Sacramento. On July 1, 1969, at approximately 10:30 p.m., Mrs. Thomason went to the door of her apartment in response to a knock and peered through a peephole. A woman outside said something but Mrs. Thomason had difficulty hearing her and opened the door. The woman and two men pushed into the apartment. The woman, whom Mrs. Thomason identified as defendant, thrust a small black or blue gun in her ribs. Defendant demanded money and ordered the men to tape Mrs. Thomason. Mrs. Thomason's face was taped with surgical tape, a pillow was placed over her face, and defendant then sat on top of the pillow. A cashier's check in the amount of $1,700, a billfold with $8, jewelry, codeine, two wiglets and some sweaters were taken.

*Count IV: Coral Reef Lodge: Bernice Conway.*

At approximately 11:40 p.m. on June 30, 1969, Bernice Conway was on duty at the same lodge which had been robbed on June 6. A man and woman entered and asked about accommodations. Mrs. Conway went to get a key. When she turned back, the woman, identified as defendant, had a small blue gun and demanded money. The robbers took $400 on this occasion.

At the trial each of the five robbery victims (Mrs. Owens, Mr. and Mrs. Gaffke, Mrs. Thomason and Mrs. Conway) identified defendant as the woman robber who held the pistol. Fred West was called as a prosecution witness. He testified that he, Christine Malich and her daughter April had participated in the June 6 holdup of the Coral Reef Lodge and in the Gaffke robbery. A man named Russell Isaacs also participated in the Gaffke episode. West stated that he had driven the robbers to both holdups in his Pontiac car, license number RXF 984. He denied part in the third and fourth robberies.

Introduced in evidence were four wigs found in defendant's apartment. Mrs. Owens said that the woman with the gun wore an elaborately curled blonde wig; Mrs. Gaffke, that the woman had curled "dirty blonde" hair which was different from that which she wore in court. Mrs. Thomason testified that the woman wore strawberry blonde hair and Mrs. Conway, that she had shoulder-length black hair which appeared to be a wig.

Christine Malich took the witness stand and denied part in any of the robberies. She denied owning a gun. She testified that her daughter, April, was 15 years old.

### Lineup and Identification Procedure

At the opening of the trial and before jury impanelment defendant moved to exclude the identification testimony of Mrs. Owens, Mr. and Mrs. Gaffke and Mrs. Conway, all of whom had previously identified Christine Malich in a police lineup. By stipulation the transcript of the preliminary examination was incorporated in the trial record for this purpose. Ground of the motion was the exclusion of defendant's attorney from a portion of the lineup proceedings.

The same four witnesses and Mrs. Thomason, victim of the robbery described in count III, had viewed defendant and four other women in a post-arrest lineup conducted by the sheriff's office. Mrs. Thomason was present with a city police officer. At defendant's request Deputy Public Defender Berkeley was present as her counsel. Pursuant to instructions from a sheriff's officer, each witness viewed the lineup separately and none com-

municated his reactions to the others. Defendant was the second woman from the left end of the lineup. After leaving the lineup room, each witness (outside the presence of the others) identified defendant as the woman robber who had held the gun.

The city police officer who accompanied Mrs. Thomason raised no objection to Mr. Berkeley's presence when Mrs. Thomason identified defendant following the lineup. Because the other robberies had occurred in the unincorporated area of the county, the sheriff's office conducted the other identification procedures. Although Mr. Berkeley had been present at the lineup, the sheriff's officers denied his demand to be present when the other lineup witnesses were interviewed.

■ On appeal, defendant charges inherent unfairness in the lineup because of the varying physical characteristics of the five women displayed to the witnesses. ■ A lineup which is "unnecessarily suggestive and conducive to irreparable mistaken identification" deprives the suspect of due process of law, and an in-court identification based upon that lineup is inadmissible. (*Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]; *People* v. *Caruso* (1968) 68 Cal.2d 183, 187-188 [65 Cal.Rptr. 336, 436 P.2d 336].) ■ The contention requires the court to consider the totality of the circumstances surrounding the lineup. (*Stovall* v. *Denno, supra; People* v. *Bauer* (1969) 1 Cal.3d 368, 374 [82 Cal.Rptr. 357, 461 P.2d 637].)

We have viewed a colored photograph of the lineup. It exhibits five Caucasian women, all clad in jail denims. The woman at the left has dark brown or black hair, the next (defendant) has dull blonde hair and the hair of the next three is reddish. The three at the left (including defendant) are of approximately the same height, the other two are somewhat taller. All are of medium build. The four at the left appear to be of the same general age, that is, between 40 and 50, the tall woman at the extreme right being somewhat younger. None bears a facial resemblance to any of the others. None has extremely distinctive features. The facial idiosyncracies among the five women are no more marked than those which normally distinguish one person from another. The lineup did not place defendant in a state of comparative physical uniqueness. (Cf. *People* v. *Caruso, supra.*) The lineup was not unnecessarily suggestive and not conducive to mistaken identification.

■ Defendant contends that the sheriff's action excluding her attorney from the actual identification immediately after the lineup violated the rules enunciated in *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], thus that the trial court was required

to exclude the in-court identifications by Mrs. Owens, Mr. and Mrs. Gaffke and Mrs. Conway. *People* v. *Williams* (1971) 3 Cal.3d 853 [92 Cal.Rptr. 6, 478 P.2d 942], decided after the trial of this case, holds that the attorney's exclusion from the actual identification after the lineup emasculates the lineup and vitiates an in-court identification based upon it. The *Williams* decision requires us to hold that Mr. Berkeley's exclusion from the actual identification transformed the lineup into an illegal confrontation as regards these particular four prosecution witnesses. ██ If an in-court identification has a source independent of the illegal confrontation preceding it, its admission is not error. If it has no independent source, then constitutional error results, which must be measured by the "harmless beyond a reasonable doubt" standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (See *People* v. *Martin* (1970) 2 Cal.3d 822, 831 [87 Cal.Rptr. 709, 471 P.2d 29]; *People* v. *Caruso* (1968) 68 Cal.2d 183, 189-190 [65 Cal.Rptr. 336, 436 P.2d 336].) That standard calls for reversal if there is a reasonable possibility that the error contributed to the conviction. (*Gilbert* v. *California, supra,* 388 U.S. at pp. 288-289 [18 L.Ed.2d at pp. 1195-1196]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 702 [47 Cal.Rptr. 909, 408 P.2d 365].)

In this case, the trial court determined as a matter of law that the attorney's exclusion did not vitiate the lineup. Hence the court did not pursue the procedure spelled out in *People* v. *Caruso, supra,* and did not assess the evidence to ascertain whether the in-court identifications had an independent source. The independent source rule is not available on appeal unless the trial court has first made the appropriate inquiry and findings. (*People* v. *Martin,* supra, 2 Cal.3d at pp. 832-835.) Hence, we are relegated to determining whether the courtroom identifications by Mrs. Owens, Mr. and Mrs. Gaffke and Mrs. Conway were harmless beyond a reasonable doubt.

██ As to count I: Mrs. Owens testified that she had a "good look" at the woman who held her at gunpoint. She noticed that the woman had a small wire on her upper right teeth, as though she were wearing a dental plate. In the courtroom, defendant wore a similar wire on her teeth. On the day before the lineup, Mrs. Owens selected defendant's picture from a group exhibited to her by a sheriff's officer. She observed the license number of the automobile in which the robbers drove away. Her testimony was thoroughly corroborated by the courtroom confession of defendant's accomplice, Fred West, who described defendant's participation and whose automobile bore a license number approximating that described by Mrs. Owens. Mrs. Owens also selected a photograph of April, defendant's daughter, from a group of police photographs. In view of the totality of

evidence fixing defendant's identity as the gun-wielding woman in the first robbery at the Coral Reef Lodge, we are convinced beyond a reasonable doubt that Mrs. Owens' courtroom identification of defendant was harmless error.

■ As to count II: A complete written analysis of Mr. and Mrs. Gaffke's testimony would occupy much space and time. Suffice it to say that both the Gaffkes made certain observations at the time of the robbery which, in composite, tended to identify defendant as the woman with the gun; that both identified Fred West as one of defendant's companions; that West himself identified defendant as one of the participants in the Gaffke robbery. Neither of the Gaffkes described unique identifying characteristics, such as the wire on the teeth or the license number of a car. The record does not establish that Mrs. Gaffke selected defendant's picture from police photographs prior to the lineup. Mr. Gaffke did select Christine Malich's photograph from a group. When, however, he was shown a lineup photograph in which April Malich appeared, he identified another girl as April. After considering the array of influences upon the verdict, we cannot reject a reasonable possibility that the courtroom identifications by Mr. and Mrs. Gaffke contributed to the verdict on count II. The judgment on count II must be reversed.

■ As to count III: Since the officers did not bar attorney Berkeley from presence at Mrs. Thomason's identification of defendant following the lineup, no constitutional error taints her courtroom identification. Defense testimony elicited the fact that Mrs. Thomason had experienced difficulty in selecting defendant's photograph from a group of police photographs. It appeared that she hesitated over defendant's photograph because the female robber wore long hair and different eye makeup. Such evidence affected the weight of Mrs. Thomason's courtroom identification, not its admissibility. (*People* v. *Rodriguez* (1970) 10 Cal.App.3d 18, 31 [88 Cal.Rptr. 789].) No error characterized Mrs. Thomason's courtroom identification of defendant.

■ As to count IV: At this point it becomes apparent that the reviewing court's harmless error appraisal and the trial court's investigation of "independent source" bear similarities. Both require a comparison of the various impressions and memories which produce the witness' ability to identify the accused. Both involve a comparative analysis of the witness' observations at the time of the crime, on any interim occasion thereafter and at the time of the illegal confrontation. There is this difference: In inquiring into independent source, the trial court probes to ascertain whether these sources are so reliable and vivid as to preclude a causal connection between the tainted lineup and the courtroom identification.

(See *People* v. *Caruso, supra,* 68 Cal.2d at p. 190.) In the harmless error inquiry, the court assumes the tainted connection but asks whether the combination of admissible tokens of identity is so compelling that the tainted courtroom identification itself becomes surplus to the array of influences inducing the verdict.

■ Mrs. Conway testified that she got a "good look" at the female robber. A week later, one day before the lineup, she selected defendant's photograph from a group of six police photographs. The pictures, in black and white and showing front and profile views, are in evidence. Viewed in profile, defendant's photographs depict a slightly prognathous chin and jaw; the eyebrows are strongly arched; the hair is fairly short, brushed back from the brow and either gray or dull blonde. Although the holdup woman wore black shoulder-length hair, Mrs. Conway unerringly selected the photograph of the woman with short, gray or blonde hair. Nevertheless, defendant's identity as the holdup woman rested entirely on Mrs. Conway's recollection. That recollection included a set of fairly strong impressions but no unique and compelling badge of identity. No other witness contributed any knowledge corroborating the victim's recalled impressions. There is a reasonable possibility that Mrs. Conway's tainted courtroom identification contributed to the guilty verdict on count IV. The judgment must be reversed as to that count.

### *Error in Trial Court's Refusal to Set Aside Information*

Defendant employs the illegal confrontation thesis as the basis for a charge that the superior court should have set aside the information for lack of probable cause to sustain the magistrate's commitment order.

At the preliminary examination defendant moved to strike her courtroom identification by Mrs. Owens, Mr. Gaffke[1] and Mrs. Conway for the same reason urged on appeal, that is, the sheriff's action in barring defendant's legal counsel from the post-lineup identification. The magistrate denied the motion. In the superior court defendant utilized the same ground as the basis for a motion to set aside the information under Penal Code section 995. She argued that illegality of the in-court identifications extracted the vital element of probable cause from her commitment to the superior court. That motion too was denied. Although defendant might then have resorted to Penal Code section 999a, seeking a writ of prohibition from the appellate courts on the ground that she had been committed without probable cause, she did not do so but went to trial.

---

[1]Mrs. Gaffke did not testify at the preliminary examination.

■ Although defendant has cited no authority on this point,[2] a substantial body of California case law holds or assumes that if a defense motion under section 995 has been denied, the absence of pretrial challenge under section 999a does not prevent the defendant from raising the erroneous denial on an appeal from the final judgment. (*Guerin* v. *Superior Court* (1969) 269 Cal.App.2d 80, 83 [75 Cal.Rptr. 923]; *People* v. *Minkowski* (1962) 204 Cal.App.2d 832, 841 [23 Cal.Rptr. 92]; *People* v. *Rosborough* (1960) 178 Cal.App.2d 156, 166-167 [2 Cal.Rptr. 669] (hg. den.); *People* v. *Fernandez* (1959) 172 Cal.App.2d 747, 750-751 [342 P.2d 309] (hg. den.); *Nelson* v. *Superior Court* (1947) 77 Cal. App.2d 783, 785 [176 P.2d 390]; see also, *People* v. *Elliott* (1960) 54 Cal.2d 498, 503 [6 Cal.Rptr. 753, 354 P.2d 225]; *People* v. *Simmons* (1897) 119 Cal. 1 [50 P. 844]; *People* v. *Dewson* (1957) 150 Cal.App.2d 119, 125 [310 P.2d 162]; *People* v. *Egan* (1946) 73 Cal.App.2d 894, 897-898 [167 P.2d 766].) This case law rests on the assumed viability of decisional holdings antedating current statutes. There are strong reasons, statutory and policy, to view the rule as an anachonism and to deny appellate review of a post-trial claim of lack of probable cause for the defendant's commitment.

Analytical examination of the rule permitting post-trial appellate review of the probable cause issue would commence with the 1897 decision in *People* v. *Simmons, supra;* would move to the 1909 amendment of Penal Code section 1259, excluding review on appeal of "any intermediate order" and restricting review to things done "at the trial or prior to or after judgment . . ." (see *People* v. *Fernandez, supra*); would then consider the 1939 and 1949 amendments of section 995, giving statutory recognition to pretrial motions in the superior court raising a claimed lack of probable cause for indictment or commitment; would recognize the impact of *Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319 [121 P.2d 713], sanctioning the writ of prohibition in the appellate court as a vehicle for pretrial review of the superior court's refusal to set aside; would consider the Greenberg rule's codification through the enactment of section 999a in 1949; would consider the 15-day limit in section 999a as an evidence of legislative purpose to put the probable cause issue to final rest if not

---

[2]The Attorney General, with some justice, urges us to disregard any claim not supported by adequate argument and citation. Ineffective presentation of a substantial or arguable assignment of error on appeal may open the door to post-conviction proceedings leading to nullification of the conviction. (See *In re Smith* (1970) 3 Cal. 3d 192 [90 Cal.Rptr. 1, 474 P.2d 969].) Thus, on criminal appeals, substantial possibilities of error should be met head-on despite the irritations caused by superficial presentation.

raised within that time.[3] Such a review would recognize the proposition that lack of probable cause for commitment adversely affects the superior court's jurisdiction to proceed only if that court is properly challenged. (See *People* v. *Elliot, supra,* 54 Cal.2d at p. 503; *Guerin* v. *Superior Court, supra,* 269 Cal.App.2d at pp. 83-84.) The analysis might conceivably culminate in the conclusion that section 999a is the exclusive road to appellate scrutiny of the probable cause issue.

From a policy standpoint the present rule ignores the expense and delay of an errorless trial of guilt which can be jeopardized by post-trial review of the commitment proceedings antedating the trial. (Cf. *People* v. *Harris* (1967) 67 Cal.2d 866, 870 [64 Cal.Rptr. 313, 434 P.2d 609].) It supplies an adroit defense attorney with the option of attacking the probable cause issue by a pretrial proceeding under section 999a or of reviving it after its hibernation throughout the trial.[4] It obstructs and delays the simplest, cheapest and quickest method of remedying a defective proceeding—return to the magistrate's court or the grand jury for a new proceeding under the guidelines developed in the course of pretrial attack. Courts are charged with consuming inordinate time in criminal prosecutions. (See Burger, W. E., *State of the Judiciary* (1970) 56 A.B.A.J. 929.) The rule permitting post-trial review of the probable cause issue adds substance to that charge.

However vulnerable to criticism and reexamination, current case law permits an appellant to attack the evidentiary basis for the magistrate's holding order in the course of appeal from the judgment of conviction. We believe ourselves bound by this case law, particularly because the Supreme Court denied petitions for hearing in *People* v. *Rosborough* and *People* v. *Fernandez, supra.* We inquire, then, whether the superior court erred in denying defendant's motion to set aside the information.

On a motion to set aside the information, the question of guilt or innocence is not before the court; rather, the court is only to determine whether the magistrate, acting as a man of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense had been committed in which the defendant had participated. (*People* v. *Hall* (1971) 3 Cal.3d 992 [92 Cal.Rptr. 304, 479 P.2d 664].)

[3] Although the Legislature did not append to section 999a an express waiver provision comparable to section 996, the 15-day limitation in the former may have been designed to preclude a defendant from raising the question later, no matter what the form of his proceeding.

[4] Penal Code section 1538.5 gives the accused an option of pretrial or post-trial review where the question is one of illegally procured evidence. The option is appropriate in that connection because illegally admitted evidence represents an ongoing question which affects the guilt trial. In contrast, the question of probable cause for the commitment of an indictment can be put to final rest before trial.

We have examined the transcript of the preliminary examination. Expectably and understandably, the People's evidence of the crimes and of Christine Malich's participation was far more limited than that presented at the trial. As to each of the four robberies, the courtroom identification by the victim formed the sole evidence of her participation. No other testimony or physical evidence pointed the finger of suspicion at Christine Malich as the woman who wielded the small blue pistol.

In the hindsight provided by *People* v. *Williams, supra,* we now know what the superior court judge did not—that the illegal post-lineup procedure vitiated the courtroom identifications by the victims other than Mrs. Thomason. The inadmissibility of these identifications subtracts from the record of the preliminary examination the only evidence of defendant's participation. There is thus no evidentiary basis for the finding of probable cause which resulted in her commitment for trial on the two Coral Reef robberies and the Gaffke robbery. Defendant was entitled to have the information set aside as to counts I, II and IV but not as to count III (the Thomason robbery).

As we concluded earlier, defendant's conviction of the Gaffke robbery (count II) and the second Coral Reef robbery (count IV) must be reversed because of the inadmissible courtroom identifications at the trial. We concluded that the error was harmless beyond a reasonable doubt as to the first Coral Reef robbery (count I). It is ironical that a parallel error at the preliminary examination should now demand reversal of the count I conviction. Conceivably, constitutional error at the preliminary examination should be harmless beyond a reasonable doubt where it is revealed on appeal after a trial of guilt characterized by substantial evidence of guilt and by freedom from prejudicial error. Under those circumstances the defendant has suffered no miscarriage of justice within the meaning of article VI, section 13, of the state Constitution. Nevertheless, California case law declares that ". . . if the defendant has not been legally committed and if the trial court erroneously denies the motion to set the commitment aside and permits the action to proceed to judgment, the resulting conviction must be reversed." (*People* v. *Elliot, supra,* 54 Cal.2d at p. 503, and cases cited.) Under the compulsion of the quoted rule, we must reverse defendant's conviction as to count I.

### Admissibility of Modus Operandi Evidence

Defendant charges prejudicial error in the admission of evidence concerning an event at the home of a Mrs. Nisitich. That event occurred about 5 p.m., June 11, 1969, a few hours preceding the Gaffke robbery. Mrs. Nisitich testified that she went to the front door of her home in

response to a knock and saw two men and two women standing outside. The man asked if Larry (her son) was home. When she told him he was not there, he demanded that they be let in and told her that they had kidnaped Larry and were going to kill him in 10 minutes unless they got money. When Mrs. Nisitich saw that the woman had a gun, she quickly slammed the door. The woman holding the gun wore long black hair, dark clothing and dark glasses. Mrs. Nisitich was unable to identify defendant as the black-haired woman, although the mouth was "similar."

Fred West took the stand and stated that he had participated in the affair at the Nisitich residence, together with Christine and April Malich and Russell Isaacs.

After measuring defendant's claim by the standards enunciated in *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91], we have concluded that the charged robberies and the Nisitich affair bore a distinctive combination of similarities which made the latter admissible as evidence of a particular *modus operandi,* thus tending to prove defendant's identity as a participant in the charged offenses. At both the Gaffke and Nisitich residences, the group asked for a member of the household by name. At both places the group consisted of two men and two women. The black hair of the woman with the pistol corresponded to the black hair described by Mrs. Conway, and the blonde wig seen by Mrs. Gaffke (a few hours after the black-haired woman appeared at the Nisitich house) corresponded with defendant's apparent habit of switching wigs and hair colors. An additional, highly distinctive common mark is West's participation in the Nisitich affair and at least two of the charged offenses. (*People* v. *Cavanaugh* (1968) 69 Cal.2d 262, 273 [70 Cal.Rptr. 438, 444 P.2d 110]; *People* v. *Haston, supra,* 69 Cal.2d at pp. 249-250.) There was no abuse of trial court discretion in permitting evidence of the Nisitich affair.

### Miscellaneous Contentions

The standard instruction on the credibility of witnesses (now published as CALJIC 2.20) was modified by deleting "his admission of untruthfulness" as one of the factors for jury consideration. Defendant complains of this deletion. Her complaint is bottomed on the assumption that Fred West was untruthful because in a written statement to the sheriff he referred to April Malich as Alice. At the trial West testified that he had referred to defendant's daughter as April and not Alice. Not only is the assumption of West's falsehood erroneous, but also he admitted no falsity. The charge of error has no substance.

Defendant charges that several statements of the trial judge in the course

of the trial demonstrate bias. The statements do not do so. Moreover, defendant fails to demonstrate any prejudice caused by these statements.

 The trial court imposed consecutive sentences on the four robbery counts. Defendant charges that the consecutive sentencing constituted cruel and unusual punishment. Quite aside from the contention's lack of merit, the claim is put to rest by this court's reversal of the judgment as to three of the counts.

The judgment is reversed as to counts I, II and IV and affirmed as to count III.

Regan, J., and Janes, J., concurred.

A petition for a rehearing was denied March 15, 1971, and respondent's petition for a hearing by the Supreme Court was denied April 14, 1971.