[Crim. No. 31886. Second Dist., Div. Five. Feb. 15, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL WILLIAM ALESI, Defendant and Appellant.

**COUNSEL**

Michael W. McIsaac, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Juliet W. Swoboda and Cynthia S. Waldamn, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**STEPHENS, J.**—Defendant was charged with, and found guilty of, possession of heroin in violation of Health and Safety Code, section 11350. Three prior convictions were charged and found true, but these were stricken for the purpose of sentence.

The dispositive facts are set forth in the transcript of the preliminary hearing of July 13, 1976.[1]

An Officer McMahon of the Glendale Police Department testified that he was present at defendant's arrest on June 10, 1976. In addition, he testified that prior to the arrest he received information that defendant was on parole and "possibly running" on a violation. McMahon contacted the Burbank parole office and spoke to the duty officer there. The duty officer said that if defendant was located, the police were to arrest him; that a teletype warrant would be provided. McMahon was told by an Officer Rollins that Parole Officer Smith verified defendant was wanted and to pick him up on a teletype warrant. On that day (June 10, 1976) McMahon went to the Eagle Rock Plaza in Los Angeles and observed defendant standing in front of the Sav-On Drugstore with a female. A Pinto was seen to drive up and stop in front of defendant and a conversation ensued. The driver of the Pinto got out, walked around the car and got back in on the passenger side. Defendant entered the driver's side; McMahon (and other officers apparently) approached the Pinto and arrested defendant for parole violation.[2] The arrest was made pursuant to the arrest warrant.

Parole Officer Smith testified that prior to June 10, 1976, defendant was in violation of his parole. Smith told Rollins to arrest defendant on sight. Smith believed that Welfare and Institutions Code section 3151 gave the parole agent authority to pick up the defendant under delegation from members of the Narcotic Addict Evaluation Authority (NAEA).

"People's 1" in evidence was the teletype document relied upon. This document is insufficient to constitute a legally valid warrant. The teletype did not contain the name of the issuing magistrate. It did not contain a statement of the charge. It did not contain the identity or address of the person to be arrested. It did not contain the name of a member of the Narcotic Addict Evaluation Authority (Welf. & Inst. Code, § 3151). What exists as a "warrant" in this case is "a number, then Glendale PD. Attention: Officer McMahon. Another number. The letters LOS/P&CS. NF-Vinewood. Then Re: Alesi, Daniel W. N-40269. DOB/12/23/32. And then the words 'This is authorization for detaining agency, LASO, and any peace officer in the State of California to arrest and book per 3151 W&IC and transport to L.A. Main County Jail. Auth: Murray Badge 627, State Parole Officer LOS/GAG.' "

---

[1]There were two preliminary hearings. At the conclusion of the first, the complaint was dismissed.

[2]A subsequent search revealed packets of heroin in defendant's possession.

In fact, at the close of the first section 995 hearing, the deputy district attorney said: "[Deputy District Attorney]: Yes, Your Honor. After the morning session adjourned, I contacted the parole office, contacted the supervisor of the deputy parole agent who issued the original abstract which in truth and in fact no warrant exists. I asked how come. He said they were about to get a warrant. They had a recommendation to take before the Parole Board, have a vote on, and then to get a magistrate to sign a warrant. That was set for June 16th. On June 10th, they were notified that the defendant was arrested pursuant to a warrant or was arrested. Since he is in custody already, we will drop these proceedings. I told them that was not the proper way to do things. I told them in fact this whole incident is not a proper way to do things. I will submit the matter."

Both preliminary hearings relied upon the same "teletype warrant"[3] and, in addition, the right of defendant's parole officer to issue the request for arrest under alleged delegated authority from the Narcotic Addict Evaluation Authority (NAEA).[4] Also, the record of the second preliminary hearing contains allusions to condition 14 of the "Conditions of Release." This condition authorizes search of the releasee's person or home at any time.

The determinative contention in this case (and making it unnecessary to answer other contentions) revolves around the right of the Glendale police to make the "teletype warrant" arrest. If the arrest was invalid, the search was illegal (*People* v. *Martin* (1964) 225 Cal.App.2d 91 [36 Cal.Rptr. 924]) and the second section 995 motion should have been granted.[5]

---

[3]Section 850 of the Penal Code reads as follows:

"(a) A telegraphic copy of a warrant or an abstract of a warrant may be sent by telegraph, teletype, or any other electronic devices, to one or more peace officers, and such copy or abstract is as effectual in the hands of any officer, and he shall proceed in the same manner under it, as though he held the original warrant issued by a magistrate or the issuing authority or agency.

"(b) An abstract of the warrant as herein referred to shall contain the following information: the warrant number, the charge, the court or agency of issuance, the subject's name, address and description, the bail, the name of the issuing magistrate or authority, and if the offense charged is a misdemeanor, whether the warrant has been certified for night service."

[4]The parole officer testified the issuance has been delegated.

[5]Section 995 of the Penal Code reads as follows:

"The indictment or information must be set aside by the court in which the defendant is arraigned, upon his motion, in either of the following cases:

"If it be an indictment:

"1. Where it is not found, endorsed, and presented as prescribed in this code.

"2. That the defendant has been indicted without reasonable or probable cause.

"If it be an information:

■ Who is empowered to issue a warrant for the retaking into custody of a California Rehabilitation Center (CRC) committee in the absence of any probable cause to believe that a new crime is or has been committed by the releasee?[6]

Sections 3151 and 3152 of the Welfare and Institutions Code are the authorizing sections for both the release of a committee and his retaking into custody.

Section 3151 of the Welfare and Institutions Code reads as follows:

"After an initial period of observation and treatment, and subject to the rules and policies established by the Director of Corrections, whenever a person committed under Article 2 or Article 3 of this chapter has recovered from his addiction or imminent danger of addiction to such an extent that, in the opinion of the Director of Corrections, release in an

---

"1. That before the filing thereof the defendant had not been legally committed by a magistrate.

"2. That the defendant had been committed without reasonable or probable cause."

[6]For ease of reference we quote pertinent portions of Welfare and Institutions Code section 3150, subdivisions (a), (d) and (e).

"(a) There is in the state government a Narcotic Addict Evaluation Authority, hereafter referred to in this article as the 'authority.' The authority shall be composed of four members, each of whom shall be appointed by the Governor, for a term of four years and until the appointment and qualification of his successor. Members shall be eligible for reappointment. The chairman of the authority shall be designated by the Governor from time to time. The terms of the members first appointed to the authority shall expire as follows: one on January 15, 1965, one on January 15, 1966, one on January 15, 1967, and one on January 15, 1968. Their successors shall hold office for terms of four years, each term to commence on the expiration date of the term of the predecessor. The Governor shall fill every vacancy for the balance of the unexpired term. Insofar as practicable, persons appointed to the authority shall have a broad background in law, sociology, law enforcement, medicine, or education, and shall have a deep interest in the rehabilitation of narcotic addicts.

". . . . . . . . . . . . . . . . .

"(d) The authority shall meet at the center or its branches at such times as may be necessary for a full and complete study of the cases of all patients who are certified by the Director of Corrections to the authority as having recovered from addiction or imminent danger of addiction to such an extent that release in an outpatient status is warranted. Other times and places of meetings may also be fixed by the authority. Where the authority performs its functions by meeting en banc in either public or executive sessions to decide matters of general policy, at least three members shall be present, and no such action shall be valid unless it is concurred in by a majority vote of those present. The authority may meet and transact business in panels. Each authority panel shall consist of at least two members of the authority. Two members of the authority shall constitute a quorum for the transaction of business of a panel. No action shall be valid unless concurred in by a majority of the members present.

"(e) Members of other similar boards may be assigned to hear cases and make recommendations to the authority. Such recommendations shall be made in accordance with policies established by a majority of the total membership of the authority."

outpatient status is warranted, the director shall certify such fact to the authority. If the director has not so certified within the preceding 12 months, in the anniversary month of the commitment of any person committed under this chapter his case shall automatically be referred to the authority for consideration of the advisability of release in outpatient status. Upon any such certification by the director or such automatic certification, the authority may release such person in an outpatient status subject to all rules and regulations adopted by the authority, and subject to all conditions imposed by the authority, whether of general applicability or restricted to the particular person released in outpatient status, and subject to being retaken and returned to inpatient status as prescribed in such rules, regulations, or conditions. The supervision of such persons while in an outpatient status shall be administered by the Department of Corrections. Such persons are not subject to the provisions of Penal Code Section 2600.

"A single member of the authority may by written or oral order suspend the release in outpatient status of such a person and cause him to be retaken, until the next meeting of the authority. The written order of any member of the authority shall be a sufficient warrant for any peace officer to return such persons to physical custody.

"It is hereby made the duty of all peace officers to execute any such order in like manner as ordinary criminal process."

Section 3152 of the Welfare and Institutions Code reads as follows:

"The rules for persons in outpatient status shall include but not be limited to close supervision of the person after release from the facility, periodic and surprise testing for narcotic use, counseling and return to inpatient status at the California Rehabilitation Center or its branches at the discretion of the authority, if from the reports of agents of the Department of Corrections or other information including reports of law enforcement officers as to the conduct of the · person, the authority concludes that it is for the best interest of the person and society that this be done."

We conclude that action by at least one member of NAEA, either orally or in writing, is necessary to order the suspension of outpatient status. We also conclude that there is no statutory or case authority permitting the members of NAEA to delegate their decisional duty in ordering a retaking. In *In re Bye* (1974) 12 Cal.3d 96, 107-108 [115

Cal.Rptr. 382, 524 P.2d 854], the court states: "We deem a prompt return policy to be fundamental to the success of the civil addict program. Section 3151 provides that '[a] single member of the [NAEA] may by written or oral order suspend the release in outpatient status of such a person and cause him to be retaken, until the next meeting of the authority.' This provision requires that in those cases where the outpatient is suspected of having resumed drug use, he must be returned to CRC *upon notice to local authorities from a NAEA member.*" (Italics added.) In footnote 11 (p. 108) the court states: "When an outpatient is taken into custody under circumstances indicating resumed drug use, or his parole agent reasonably fears that the outpatient is in danger of returning to narcotics, the agent must notify NAEA immediately. As previously stated, any NAEA member may order the outpatient returned to CRC pursuant to section 3151."

We read the prosecution's arguments as effectively (though somewhat equivocally) conceding that there was no warrant for retaking in the instant case. It certainly is beyond doubt that no member of NAEA gave a retake order. Under these conditions *People* v. *Veloz* (1971) 22 Cal.App.3d 499 [99 Cal.Rptr. 519], relied upon by the prosecution, is not authority; in that case there was a warrant and the arresting officer had been given its number.[7] *People* v. *Jasso* (1969) 2 Cal.App.3d 955 [82 Cal.Rptr. 299], is of the same type, i.e., where a warrant had in fact been issued by the NAEA pursuant to section 3151 of the Welfare and Institutions Code.

The criticism by the prosecution of the limitation which we read into section 3151 (limiting the actual issuance of a warrant to a member of NAEA) fails of conviction. It is for the Legislature to make the laws, not the courts or litigants.

██  The People next rely on condition 14 of the "Conditions of Release to Out-patient Status." Condition 14 provides as follows: "SEARCH: You shall submit to a search of your person, your residence

---

[7]*People* v. *Clark* (1968) 263 Cal.App.2d 87, 92 [69 Cal.Rptr. 218], recognizes the difference in status between a criminal-parolee and a CRC outpatient: "To what extent the parolee's suspension of civil rights was necessary to the *Hernandez* [229 Cal.App.2d 143] result is hard to say. An answer to the question would be important in the case at bar if Dashkin [defendant's parole agent] did not have probable cause to believe that defendant had committed a crime, because outpatients from Corona, by express provision in section 3151 of the Welfare and Institution Code, are not subject to the suspension of civil rights imposed upon parolees from state prison by section 2600 of the Penal Code; . . ."

and any property under your control by your agent, any agent of the Department of Corrections or law enforcement officer."

On its face, condition 14 appears to authorize the search of appellant by the Glendale police officers. The fact that they arrested him as a parole violator in reliance on a warrant which failed to materialize does not detract from their authority to search pursuant to condition 14.[8] However, since the arrest and search were made outside the jurisdiction of the Glendale police officers, the validity of their actions depends on whether or not they qualify under the law as "law enforcement officers," as that term is used in condition 14. In resolving this question, we are limited to the evidence before the trial court at the section 995 hearing. Additional evidence submitted to the court at the subsequent section 1538.5 hearing cannot be considered to determine the correctness of the trial court's ruling on appellant's section 995 motion.

Viewing the record in that perspective, there is no evidence to permit the arrest of appellant unless the officers would have been so authorized as private citizens.[9] Absent the evidence introduced at the section 1538.5 hearing that the officers had probable cause to believe that a felony was being committed in their presence and that there was the immediate danger that the perpetrator (appellant) would escape, the officers were not authorized either to arrest appellant or to search him under the authority of condition 14.

Thus, the section 995 motion should have been granted by the trial court and subsequent proceedings cannot cure that error. (*People* v. *Malich* (1971) 15 Cal.App.3d 253, 266 [93 Cal.Rptr. 87].)

The judgment is reversed.

Kaus, P. J., and Ashby, J., concurred.

---

[8] *People* v. *Gallegos* (1964) 62 Cal.2d 176 [41 Cal.Rptr. 590, 397 P.2d 174], cited by appellant, is not in point. There the police had no idea that defendant was a parolee at the time of the search. In the instant case the police not only knew of his status as a parolee but had been requested by his parole agent to arrest him.

[9] Contrary to the stipulation by the People the police officers had only the authority of private citizens outside Glendale. Penal Code section 830.1, subdivision (c), may have conferred full peace officer authority on the officers based on the evidence introduced at the section 1538.5 hearing, but we need make no holding on that issue.