[Crim. No. 13747. In Bank. July 8, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD KENNETH MARTIN, Defendant and Appellant.

824

## COUNSEL

Gene A. Noland, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Eric Collins, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SULLIVAN, J.**—A jury found defendant Ronald Kenneth Martin guilty of robbery in the second degree. (Pen. Code, §§ 211, 211a.) He was sentenced to state prison for the term prescribed by law with the minimum term specified at six months. (See Pen. Code, § 1202b.) He appeals from the judgment of conviction.

During the evening of January 5, 1968, between 7:30 and 8 p.m., Mrs. Mary McCauley left the Vallejo Bible Church carrying two folding chairs which she intended to put into her automobile parked nearby. As she approached her car a young black man walked in front of her and looked at her in a way that frightened her. Because of her fear, she leaned the two chairs against the side of her car and proceeded back to the church. She had difficulty handling her keys and in opening the church door. As she opened the door, another black youth approached and began to tug at her purse. Mrs. McCauley and the youth struggled over the purse for a period of time that seemed to Mrs. McCauley to be a minute or a minute and a half. When the strap broke, the youth escaped with her purse containing $106, credit cards, a driver's license, and a bankbook. By the time she had gotten to her feet the youth had vanished.

Mrs. McCauley immediately called the police and reported the theft. She described the robber as a young Negro male with "high processed hair," dressed all in dark clothing with a black sweater and "something close about his neck, such as a turtleneck." Her description indicated that the youth was 5 feet 7 inches to 5 feet 9 inches tall. She did not specify that the youth wore a mustache. The offense was reported over police radios along with a description of the robber; the radio report stated that the robber was 5 feet 8 inches tall.

About an hour and a half later police officers stopped an automobile containing three black youths for the sole reason that one of the passengers appeared to the officers to match the broadcast description. However the passenger in question, who was defendant, was wearing a buttoned cardigan over a visible white shirt with brown stripes, grey slacks, and a hat. He also had with him a black scarf, used to hold his hair down. He had a thin mustache. When first seen by the officers, he was sitting in the car so that his height could not easily be determined; after he alighted, one of the officers judged his height to be between 5 feet 10 inches and 5 feet 11 inches. Defendant told the officers that he was 6 feet 1 inch tall and weighed 150 pounds. The record does not otherwise indicate his actual height.

At the officers' request defendant voluntarily accompanied them to the police station for viewing by the victim. He was not arrested at this time and was not advised as to his legal rights. In the meantime, the victim of the robbery, Mrs. McCauley, was brought in a patrol car to the police station where she was joined by her husband, a Vallejo police officer. She examined without success a number of police photographs in an attempt to identify the robber.[1] She then viewed, through a one-way mirror, two black youths accompanied by an individual in civilian clothes. Mrs. McCauley immediately rejected one of the two, but considered the other for a little longer because he wore dark clothing and was of approximately the right height.

Some time later that evening Mrs. McCauley was again brought to the same room for the purpose of viewing a suspect. She testified at trial that on this second occasion she was accompanied by her husband (Officer McCauley) and Miss Birch, a Vallejo policewoman. However, Officer McCauley testified that he was not present at this time although he had been present during her viewing of the two other youths. In any event at this time Mrs. McCauley viewed, through the one-way mirror, defendant who was brought in alone by a uniformed officer. A report filed by Miss Birch recorded that "Mrs. McCauley [was] very nervous and upset, and stated that although the subject looked like the responsible [sic], she could not definitely state Martin was the responsible [sic]." Miss Birch testified at trial that Mrs. McCauley "stated she could not definitely swear that this was the man; she was positive that it was him, but could not definitely swear." At trial Mrs. McCauley denied having made these statements at the viewing. She testified that she positively identified defendant by his face and was uncertain only because he was wearing a white shirt at the viewing rather than a dark "turtleneck."

Several hours after the viewing, about 1 a.m., the officer in charge of the investigation telephoned Mrs. McCauley because he was apparently troubled as to whether he should continue to hold defendant. He asked Officer McCauley, who had answered the phone, whether his wife, who had retired for the night, would return to the station to view the defendant again. At the trial, Mrs. McCauley testified, "When the phone rang and my husband answered the phone, he turned to me and asked me if I would like to go back down. And I said, 'It wouldn't do any good, because he is the one.' I was already sure in my mind; . . . I told him, 'It wouldn't do any good to go back down.' So we didn't. And that was what he told him."[2]

---

[1] It does not appear whether a picture of defendant was included among those viewed by Mrs. McCauley.

[2] The next evening Mrs. McCauley again went to the police station and viewed Anthony Williams, one of the other youths who were in the car in which defendant

At some time after the viewing defendant was arrested and advised of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. His wallet was found to contain $34. The record does not indicate that any of Mrs. McCauley's credit cards or her driver's license or bankbook were found in defendant's possession.

A few days after the robbery, a 12-year-old boy found Mrs. McCauley's purse near his home and returned it to Officer McCauley. Officer McCauley dusted the purse for fingerprints and found two smudged prints; but although he was not an expert in fingerprinting, he decided not to forward the prints to any agency for identification. The purse did not contain Mrs. McCauley's money nor her driver's license and at least one credit card was missing, all of which items remain unaccounted for.

After the preliminary examination defendant was held to answer on the charge of robbery. On February 22, 1968, defendant moved under section 995 of the Penal Code to set aside the information on the ground that any identification evidence to be given by the victim and sole witness was tainted by the illegal pretrial confrontation. After a hearing, the motion was denied.

At trial Mrs. McCauley on direct examination made without objection an in-court identification of defendant as the youth who had stolen her purse. On cross-examination she testified relative to the pretrial identification procedures in which she had participated at the police station on the night of the robbery; she also stated that her in-court identification was based upon "what happened at the church" rather than "what [she] saw at the police station."

The prosecution completed its case in chief with the testimony of Officer McCauley. The defense then called Policewoman Birch, who testified as above indicated relative to the viewing at the police station. At this point defendant moved out of the presence of the jury that the testimony of the victim Mrs. McCauley be excluded on the authority of *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]. The prosecutor raised no objection to the consideration of the motion at that time. The court then recalled as its own witness Mrs. McCauley, who testified further concerning her viewing of defendant at the police station but gave no further testimony concerning her observation of the perpetrator of the crime at the time of its commission.

---

was riding. The specific results of this viewing—which was apparently intended to identify the youth who had startled Mrs. McCauley prior to the robbery—do not appear in the record, but charges subsequently brought against Williams were dropped after the preliminary examination.

At the conclusion of the victim's testimony the court ruled as follows: "Well, gentlemen, it appearing that from the standpoint of refreshing the Court's recollection, that our library copy of U.S. versus Wade has been removed and is missing for some time. No one else today having a copy of the opinion, for present purposes I will deny the defendant's motion with leave to—or it may be deemed to be resubmitted at the close of the case, if need be, for reconsideration." The matter was not again mentioned during the course of the trial.

Defendant testified in his own behalf and sought to establish an alibi.[3] On cross-examination he admitted a prior conviction of two counts of robbery. The jury found him guilty of second degree robbery.

A month later, upon defendant's arraignment for judgment the court addressed itself to his motion for new trial. After stating that it had reviewed the relevant authorities, suggesting that the pretrial confrontation in question was indeed violative of *Wade,* and recognizing that this fact required a determination as to independent origin on its part, the court stated: "The Court . . . has reviewed the evidence which was adduced in the course of this trial. And, conceding that several of the points raised in *Wade* and *Stovall* were present here, the Court nevertheless has concluded that the in-court identification by the victim in this case had an independent origin and she also testified as to her specific observations at the time and place of the robbery itself. [Par.] Accordingly, the motion for the new trial is denied. . . ."

Defendant contends that the victim's viewing of him at the Vallejo police station on January 5, 1968,[4] was conducted in violation of the constitutional principles enunciated in *United States* v. *Wade, supra,* 388 U.S. 218, and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]. We agree.

The confrontation in question, although not a formal lineup (see *People* v. *Fowler* (1969) 1 Cal.3d 335 [82 Cal.Rptr. 363, 461 P.2d 643]; *People* v. *Banks* (1970) *ante,* p. 127 [84 Cal.Rptr. 367, 465 P.2d 263]), was a "critical stage of the prosecution" at which the right to counsel attached. As we said in *People* v. *Fowler, supra,* "[T]he proper determination of whether the *Wade-Gilbert* rules (regarding attachment of the Sixth Amend-

---

[3]Defendant testified to the effect that he was at the home of a friend at the time of the robbery and that afterwards they "caught a ride" with Anthony Williams, the owner of the car in which defendant was riding. (See fn. 2, *ante.*) The alibi was corroborated to some extent by the sister of defendant's friend.

[4]Because the confrontation in question took place after June 12, 1967, the date of the *Wade* and *Gilbert* decisions, the principles and rules enunciated in those cases are applicable to the instant case. (*Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967].)

ment right to counsel) rather than the *Stovall* rule (requiring basic due process in all pretrial confrontations) are applicable to a particular case, will be achieved only by a careful balancing of the need for prompt non-lineup identification in light of the cricumstances, against the need for and ability of counsel to help avoid erroneous identification. Each case will of necessity call upon the courts 'to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.' *(United States v. Wade, supra,* 388 U.S. 218, 227 [18 L.Ed.2d 1149, 1157, 87 S.Ct. 1926].)" (1 Cal.3d at pp. 344-345, fn. 16.)

In the instant case the need for identification outside the context of a formal lineup was slight. Although defendant "voluntarily" accompanied the officers to the police station, the circumstances of his apprehension lead us to conclude that he was in custody[5] in a constitutional sense because he could reasonably have believed that he was deprived of his freedom of action. (See *People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515]; *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700].) Nothing has been shown which would indicate that a formal lineup with full constitutional protections was rendered impractical by the circumstances. Indeed, it appears that at least two persons of defendant's general physical characteristics were available for this purpose.

On the other hand it appears that the nonlineup confrontation here utilized was subject to those dangers of suggestion which led the Supreme Court to conclude that a formal lineup was a critical stage of the prosecution requiring the presence of counsel in the absence of other suitable safeguards. (See *People* v. *Fowler, supra,* 1 Cal.3d 335, 347.) Indeed, such dangers are present to an even greater extent in the type of confrontation here in question because the risks of suggestion are manifestly augmented. Whereas in a lineup situation an identifying witness must at least choose among persons having some physical resemblance to one another, a one-to-one viewing requires only the assent of the witness. (See *United States* v. *Wade, supra,* 388 U.S. 218, 229 [18 L.Ed.2d 1149, 1158-1159].) Moreover, the possibility of mistaken identification is further increased when, as here, the suspect is displayed to the witness in the company of a uniformed officer—the witness having viewed other subjects

---

[5]Our factual summary has stated that defendant was not formally arrested when he was apprehended and taken to the police station but was arrested only after he had been identified by Mrs. McCauley. This conclusion, while compelled by the testimony, is directly contrary to a stipulation made by the prosecutor during proceedings on the motion to exclude Mrs. McCauley's testimony. Because we do not consider the factor of formal arrest to be of crucial significance, we state the facts as related by the testimony of witnesses rather than according to the stipulation of counsel.

accompanied by nonuniformed persons.[6] In sum, it is clear that the confrontation here in question was one in which the risks of suggestion and mistaken identification were considerable. The presence of counsel might well have reduced those risks, if only through a comprehensive testimonial reconstruction of the confrontation at trial.

█ We conclude that the risks of mistaken identification inherent in the procedure here employed—which risks could have been mitigated by the presence of counsel—far outweigh the need to resort to such a procedure rather than a formal lineup with all constitutional protections, and that therefore the viewing in question was a critical stage of the proceedings within the meaning of *Wade* to which the right to the assistance of counsel attached.[7] Because defendant was not represented by counsel at the confrontation and there is no showing that he effectively waived the right to be so represented,[8] the viewing of January 5, 1968, was conducted in violation of the principles enunciated in *Wade* and *Gilbert.*

█ This determination of itself does not compel the further conclusion that a defendant's trial was infected with fatal error. A pretrial violation of the rules announced in *Wade* and *Gilbert* does not automatically generate error in the trial unless the violation is there exploited by the prosecution. Here, in contrast to *People* v. *Fowler, supra,* and *People* v. *Banks, supra, ante,* p. 127, evidence of the improper pretrial confrontation was not placed before the jury by the prosecution; the matter was raised for the first time by the defense in its cross-examination of the victim. Thus the rule of *Gilbert* v. *California, supra,* 388 U.S. 263, 272-273 [18 L.Ed.2d 1178, 1186-1187], which renders erroneous per se the admission of evidence of an illegal confrontation offered by the prosecution, is inapplicable to this case. (See *United States* v. *Wade, supra,* 388 U.S. 218, 240 [18 L.Ed.2d 1149, 1164-1165]; cf. *People* v. *Fowler, supra,* 1 Cal.3d 335, 349-350; *People* v. *Banks, supra, ante,* pp. 127, 134.)[9]

---

[6]In *Wade* the court, referring to the one-to-one confrontation which occurred in *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], said: "[T]he vice of suggestion created by the identification in *Stovall, supra,* was the presentation to the witness of the suspect alone handcuffed to police officers. It is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police. See Frankfurter, The Case of Sacco and Vanzetti 31-32." (388 U.S. at p. 234 [18 L.Ed.2d at p. 1161].)

[7]The fact that the confrontation took place prior to formal accusation is of no moment. (*People* v. *Fowler, supra,* 1 Cal.3d 335, 342-344.)

[8]Although the viewing was held subsequent to the *Wade* and *Gilbert* decisions it appears that defendant was not informed of his rights under those decisions either prior to the viewing or at any time thereafter.

[9]In *Wade* itself evidence of the illegal confrontation was placed before the jury by the defense. (388 U.S. at p. 220 [18 L.Ed.2d at p. 1153].) The *Gilbert* rule of error per se was not applied.

■ However, *Wade* teaches that error may result even in the absence of direct evidentiary use of an illegal pretrial confrontation by the prosecution, for an *in-court* identification may itself be so tainted by the prior confrontation as to render its admission erroneous. "[T]he proper test to be applied in these situations is that quoted in *Wong Sun* v. *United States,* 371 U.S. 471, 488, ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt 221 (1959).' See also *Hoffa* v. *United States,* 385 U.S. 293, 309. Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." (Fn. omitted.) *(United States* v. *Wade, supra,* 388 U.S. 218, 241 [18 L.Ed.2d 1149, 1165].)[10]

It is the application of this principle—variously styled the "independent source" or "independent origin" rule—to the particular case before us which is our present concern. ■ As we understand the *Wade* and *Gilbert* decisions, the admission of an in-court identification which has a source or origin "independent" of the illegal pretrial confrontation is not error, whereas the admission of an in-court identification which is not shown to be "independent" of such a confrontation is error of constitutional dimension and compels reversal unless shown to be "harmless beyond a reasonable doubt" under the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. *(People* v. *Fowler, supra,* 1 Cal.3d 335, 341, 350.)

Because the victim in the instant case was the only witness to the crime, error in the admission of her in-court identification could not have been harmless. The determination as to whether such error occurred—and thus as to whether her in-court identification had a source or origin "independent" of the illegal confrontation—is therefore crucial.

---

[10]In a footnote the high court went on to say: "Thus it is not the case that '[i]t matters not how well the witness knows the suspect, whether the witness is the suspect's mother, brother, or long-time associate, and no matter how long or well the witness observed the perpetrator at the scene of the crime.' Such factors will have an important bearing upon the true basis of the witness' in-court identification." (388 U.S. at pp. 241-242, fn. 33 [18 L.Ed.2d at pp. 1165-1166].)

We reiterate the facts relevant to our determination of this matter in the instant case. Although the in-court identification made by Mrs. Mc-Cauley was challenged on *Wade-Gilbert* grounds before the trial court,[11] and a hearing was held out of the presence of the jury at which evidence of the circumstances of the pretrial confrontation was presented, no inquiry was undertaken as to whether the challenged in-court identification had a source or origin "independent" of the pretrial confrontation according to the standards enunciated in *Wade,* and the court made no finding on that point. Not until the hearing of defendant's motion for new trial—more than a month after the return of the verdict—did the court, concluding that the pretrial confrontation had indeed been violative of *Wade,* determine that the in-court identification had had an origin independent of that confrontation because the victim "testified as to her specific observations at the time and place of the robbery itself."

■ We do not think that the trial court's consideration of the matter of independent origin on the motion for new trial was the legal equivalent of such consideration and determination at trial. A trial court ruling on a motion for new trial does so under the influence of what amounts to a presumption in favor of the correctness of the verdict and the proceedings supporting it. (Cf. *People* v. *Robarge* (1953) 41 Cal.2d 628, 633 [262 P.2d 14], and cases there cited.) Clearly a quite different attitude is required when the court undertakes to determine and assess "preliminary" or "foundational" facts upon which the admissibility of evidence depends. (See Evid. Code, § 400 et seq.)

Moreover, and putting to one side this problem of belated consideration, it appears that when the trial court *did* address itself to the problem of *Wade-Gilbert* error on the motion for new trial, and after it had concluded that the pretrial confrontation was indeed violative of defendant's rights, it did not then proceed to determine the question of admissibility of the in-court identification in the manner required by *Wade* and the decision of this court in *People* v. *Caruso* (1968) 68 Cal.2d 183, 189-190 [65 Cal.Rptr. 336, 436 P.2d 336]. ■ Those decisions require that the trial court, upon concluding that a constitutionally defective pretrial

---

[11]It has not been contended that defendant waived any error in the admission of Mrs. McCauley's in-court identification by failing to object thereto when it was offered in evidence. While we consider that an in-court identification is most properly challenged on *Wade-Gilbert* grounds by means of a pretrial motion to suppress (see *People* v. *Fowler, supra,* 1 Cal.3d 335; *People* v. *Banks, supra,* 2 Cal.3d 127) or by timely objection at the time of introduction into evidence, we think that defendant's continuing and vigorous efforts to raise the *Wade-Gilbert* issue in this case warrant our present consideration of its merits.

confrontation has occurred,[12] proceed to assess the taint of that confrontation relative to in-court identification by reference to the factors set forth in *Wade* (see text accompanying fn. 10, *ante*). Such an assessment in the instant case would have required that the trial court take into consideration matters such as (1) the lighting and opportunity for observation at the time of the offense; (2) the clear discrepancy between the description given by the victim after the offense and defendant's actual physical characteristics; (3) the uncertainty manifested by the victim at the time of the pretrial confrontation and afterwards; and (4) the failure of the victim to identify defendant by photograph.[13] Finally, and most significantly, the trial court must exclude the in-court identification unless it concludes that the People have established "by clear and convincing evidence"[14] that that identification is purged of the taint caused by the illegal confrontation. (See *United States* v. *Wade, supra,* 388 U.S. 218, 239-242 [18 L.Ed.2d 1149, 1164-1166]; *People* v. *Caruso, supra,* 68 Cal.2d 183, 189-190; *Clemons* v. *United States* (D.C. Cir. 1968) 408 F.2d 1230, 1237.)

In summary, we think it manifest that the trial court's disposition of the question of independent source or origin did not comport with the requirements of *Wade* and *Caruso*. In addition to the fact that the ruling was made in the context of a new trial motion—where the presumption in favor of the verdict comes into direct conflict with the People's burden of showing independent source by clear and convincing evidence—the trial court's expressed reason for its ruling shows that an inquiry of the type demanded by *Wade* and *Caruso* was not undertaken. That reason— that the victim "testified as to her specific observations at the time and place of the robbery itself"—simply begs the question which the procedures contemplated by *Wade* and *Caruso* are designed to answer: How did her testimony as to her specific observations tend to show that her in-court identification was not infected with the taint of the illegal pretrial confrontation?

---

[12]It has been suggested that it is in the interest of expeditious judicial administration that the trial court consider and determine the matter of independent source even when it concludes that a challenged pretrial confrontation *did not* involve the violation of defendant's constitutional rights. (*Clemons* v. *United States* (D.C. Cir. 1968) 408 F.2d 1230, 1237.)

[13]As we have indicated the record does not establish whether or not a picture of defendant was among those viewed by Mrs. McCauley. (See fn. 1, *ante*.)

[14]" 'The phrase, "clear and convincing evidence" has been defined as "clear, explicit, and unequivocal," "so clear as to leave no substantial doubt," and "sufficiently strong to demand the unhesitating assent of every reasonable mind." ' (*In re Jost* (1953) 117 Cal.App.2d 379, 383 [256 P.2d 71].)" (*People* v. *Caruso, supra,* 68 Cal.2d 183, 190.)

In these circumstances we must conclude that the in-court identification of Mrs. McCauley was admitted against defendant without a proper trial court determination as to whether that in-court identification was tainted by the illegal pretrial confrontation. (Cf. *Clemons* v. *United States, supra,* 408 F.2d 1230; *Frazier* v. *United States* (D.C. Cir. 1969) 419 F.2d 1161, 1170.) As we have indicated, unless the in-court identification was purged of the primary taint of the illegal confrontation, its admission was prejudicial error.

It remains to decide the proper disposition of the case. We might now undertake to determine the question at issue on the basis of the cold record—as we have done heretofore in a case involving a pre-*Wade* confrontation. (*In re Hill* (1969) 71 Cal.2d 997, 1006-1007 [80 Cal.Rptr. 537, 458 P.2d 449].)

However, we think it more appropriate in this case—which involved a post-*Wade* confrontation subject to all of the standards and procedures enunciated in *Wade*—to adopt the course taken by the high court in *Wade* and *Gilbert* themselves. Thus, in *Wade* (a case emanating from the federal courts) the court expressed reluctance to make a determination "without first giving the Government the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." (388 U.S. at p. 240 [18 L.Ed.2d at p. 1164].) Observing that "[t]hat inquiry is most properly made in the District Court" (388 U.S. at p. 242 [18 L.Ed.2d at p. 1166]), the court vacated the conviction pending a trial court hearing in the premises.

Similarly in *Gilbert* (a state case) the high court held that "The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error" but that "as in *Wade,* the record does not permit an informed judgment whether the in-court identifications . . . had an independent source." (388 U.S. at p. 272 [18 L.Ed.2d at p. 1186].) Accordingly, the high court again vacated the conviction "pending the holding of such proceedings as the California Supreme Court may deem appropriate to afford the State the opportunity to establish that the in-court identifications had an independent source, or that their introduction in evidence was in any event harmless error." (388 U.S. at p. 272 [18 L.Ed.2d at p. 1186].) On remand this court vacated its prior decision (*People* v. *Gilbert* (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365]) and reversed the judgments.[15] (Minute Order, July 26, 1967.)

---

[15]A new trial was had in *Gilbert* and that matter is again pending before us on automatic appeal.

■ We believe that the circumstances of the instant case render it appropriate that the People be given an opportunity to show by clear and convincing evidence that Mrs. McCauley's in-court identification was not tainted by the illegal confrontation at which she identified defendant prior to trial. The trial court's failure to resolve the issue at trial operated to deprive the People of that opportunity. Because identification was the sole issue at trial we think that a special hearing on the matter of independent source or origin would be inappropriate, and that the judgment should be reversed for an entire new trial.

Defendant's additional contention—that Officer McCauley's failure to seek identification of the fingerprints found on the victim's purse amounted to suppression of evidence—is without merit.

The judgment is reversed.

Burke, Acting C. J., Peters, J., Tobriner, J., Mosk, J., and Draper, J.,* concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment.

---

*Assigned by the Chairman of the Judicial Council.