[Crim. No. 4107. Fourth Dist., Div. Two. July 16, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
MACK LYONS, JR., Defendant and Appellant.

**COUNSEL**

Paul A. Hanna, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Joel S. Moskowitz, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KAUFMAN, J.**—In a two-count information, defendant was charged with robbery involving the use of a deadly weapon (Pen. Code, § 211; count I) and burglary (Pen. Code, § 459; count II). The information also alleged with respect to count II that defendant was armed with a deadly weapon and further alleged a prior conviction of burglary.

Pleas of not guilty and not guilty by reason of insanity were entered. Defendant admitted the prior conviction. A jury found defendant guilty of the charged offense; determined the robbery to be first degree and found the deadly weapon allegations true. Defendant's motion for new trial was denied; probation was denied and defendant was sentenced to state prison

for the term prescribed by law on each count. Execution of sentence on count II (the burglary charge) was stayed.

Defendant appeals from the judgment of conviction, contending that: his pretrial and in-court identifications by John Etchandy were erroneously admitted into evidence; defendant's extrajudicial confessions were erroneously admitted into evidence; the jury was improperly instructed; the prosecutor committed prejudicial misconduct; defendant's motion for new trial was improperly denied; his plea of not guilty by reason of insanity was not properly disposed of; and the sentence imposed by the court violated the prohibition against double punishment contained in Penal Code section 654.

### Perpetration of the Crime and Defendant's Identification

On July 27, 1969, John Etchandy and his fiance, Juanita Gruwell, were in Bo-Jon's Liquor Store in Garden Grove. Mr. Etchandy was the owner of the liquor store. At 10 p.m., Mr. Etchandy had taken the cash and checks from the safe and was getting ready to list the checks. Miss Gruwell kicked him and said something like "Ditch the money." Mr. Etchandy turned around and saw two men coming into the store. One of them was subsequently identified as defendant as hereinafter detailed.

Defendant was described as having had long hair tied in a ponytail, a mustache and whiskers. Defendant remained in the liquor store from two to four minutes. He was not wearing a mask.

Defendant pulled out a greyish-blue revolver and said, "This is a stick-up." He and the other man took approximately $600 from the cash register. While these events were transpiring, a customer came into the store. Defendant said to the customer, "This is a stick-up . . . . Give me your wallet." After defendant received the wallet he looked through it and gave it back to the customer. Defendant and his confederate then left the store.

Mr. Etchandy got a rifle and went outside. He saw defendant and his confederate running. Mr. Etchandy fired two shots in the direction of the fleeing robbers.

At trial Miss Gruwell made a positive identification of defendant as the robber who had the ponytail, mustache and whiskers and who held the gun. She further testified that she had made a positive pretrial identification of defendant from a group of photographs shown to her by the police. She was shown batches of photographs on three different occasions. She selected defendant's photograph from the third batch. There is no indication in the record that the photographic identification was in any way suggestive or unfair.

At trial, over defense objection, Mr. Etchandy was permitted to make a positive in-court identification of defendant as the robber with the gun, the ponytail, mustache and whiskers and, further, to testify that he had made a positive pretrial identification of defendant. ■ Defendant contended at trial, as he does on appeal, that, at the pretrial identification, he was entitled to be and was not represented by counsel (*United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; *People* v. *Fowler,* 1 Cal. 3d 335, 349 [82 Cal.Rptr. 363, 461 P.2d 643]); that absent a determination by the trial court that the in-court identification had a source independent of the illegal pretrial identification, the in-court identification testimony, like the testimony of the pretrial identification was erroneously admitted (*People* v. *Martin,* 2 Cal.3d 822, 832-833 [87 Cal.Rptr. 709, 471 P.2d 29]); and that it is not shown "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]; *People* v. *Fowler, supra,* 1 Cal.3d at p. 350).

Upon defendant's objection to the in-court identification testimony by Mr. Etchandy, the court held a hearing out of the presence of the jury during which the following facts were developed. Subsequent to the robbery, Mr. Etchandy was shown mug shots by the police but was unable to identify any of the photographs as being either of the robbers. On August 26, 1969,[1] Mr. Etchandy received a telephone call from someone in the Garden Grove Police Department who asked him to go to Division 4 of the West Orange County Municipal Court. In the hall outside the courtroom, he was met by Officer Lowery. Officer Lowery had not placed the telephone call to Mr. Etchandy, nor had he had any substantial prior contact with the case. He was frequently in that court on official business and was asked by another officer of the Garden Grove police to meet Mr. Etchandy at the courthouse for the purpose of having him attempt an identification of defendant who was to be in court, apparently for arraignment. Officer Lowery made no statements to Mr. Etchandy suggestive of defendant's identification. When he met Etchandy in the hall, Lowery stated ". . . I am to meet you here for the purpose of looking at some persons in the courtroom and seeing if identification could be made."

When the court was in recess and the judge absent from the bench, Officer Lowery and Mr. Etchandy entered the courtroom. Mr. Etchandy looked around the courtroom. He saw no one he recognized in the spectator section. The jury box in the courtroom was occupied by from 8 to 10 male

---

[1]Originally the testimony was that the date was August 29, 1969, but subsequent evidence and testimony established that the correct date probably was August 26.

persons. Immediately, upon looking at the jury box, Mr. Etchandy recognized defendant. He then went closer to the jury box to get a better look, returned and told Detective Lowery that defendant was one of the robbers. Defendant looked the same as he did on the night of the robbery except that his hair was not in a ponytail, and he had shaved off his beard.

Officer Lowery then asked "Is there anyone else in the courtroom?" Mr. Etchandy looked at the jury box again and saw a man he identified as the other robber (Robert Griffin). Although he said nothing about it to Mr. Etchandy, Officer Lowery recognized defendant and Robert Griffin from prior contact with them.

The trial court ruled that this pretrial identification procedure was not equivalent to a lineup and was not such as to entitle defendant to be represented thereat by counsel.[2] It is not essential that we resolve this problem.[3] Even if Mr. Etchandy's identification testimony was erroneously received, the remaining evidence against defendant was overwhelming and shows "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California, supra,* 386 U.S. 18, 24;

[2]Having made this determination, the trial court had no occasion to reach the question of the independent source of the in-court identification by Mr. Etchandy. Subsequently, however, Mr. Etchandy testified that his recollection of what defendant looked like at the time of the crime was in no way reinforced by having seen him in the jury box at the municipal court.

[3]While there is some uncertainty as to the proper function of the accused's attorney at a pretrial identification (see *People* v. *Williams,* 3 Cal.3d 853, 859-860 [92 Cal.Rptr. 6, 478 P.2d 942] [dissenting opinion of Mosk, J.]), a defendant may be entitled to representation by counsel at any particular pretrial confrontation or exhibition of his person to potential witnesses (*United States* v. *Wade, supra,* 388 U.S. 218, 227 [18 L.Ed.2d 1149, 1157]; *People* v. *Lawrence,* 4 Cal.3d 273, 278 [93 Cal.Rptr. 204, 481 P.2d 212]; *People* v. *Almengor,* 268 Cal.App.2d 614, 617-618 [74 Cal.Rptr. 213]). The right to counsel at a lineup rests in substantial part on the fact that the accused is in the custody of the exhibiting law enforcement agency which has control over the time, composition and circumstances of the lineup, including the clothing worn, the acts performed and the words spoken. (See *People* v. *Lawrence, supra,* 4 Cal.3d at p. 278.) Most of these elements were absent in Mr. Etchandy's pretrial identification of defendant. Defendant was in the jury box along with eight or nine other male persons. The Garden Grove police had no control over the time at which defendant would be present, who would be in the box at that particular time, what they would wear, the movements they would perform or the words they would speak. Additionally, unlike a lineup, the identity of the other persons present in the jury box could be established by the records of the court and the jailer. On the other hand, to the extent that the right to counsel at a lineup was established "to enable an accused to detect any unfairness in his confrontation with the witness, and to insure that he will be aware of any suggestion by law enforcement officers, intentional or unintentional, at the time the witness makes his identification" (*People* v. *Williams, supra,* 3 Cal.3d at p. 856), the right to counsel at a pretrial identification such as that in the case at bench is indicated. The accused may not even be aware that he is being identified and, having therefore no reason to recollect the event, would have greater trouble detecting or recollecting any unfairness than he would in a lineup situation.

*Harrington* v. *California,* 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726]; *People* v. *Fowler, supra,* 1 Cal.3d at p. 350.) Miss Gruwell was a percipient witness to the crime. She positively identified defendant both in court and by a pretrial photographic identification. In view of Miss Gruwell's testimony and defendant's three confessions, there is not the slightest doubt that the jury would have returned the same verdict absent the identification testimony of Mr. Etchandy.

### *Defendant's Detention, Arrest and Confessions*

On the day of trial, prior to selection of the jury, defendant made a motion to suppress all evidence of his confessions on several grounds: that his confessions resulted from an unlawful detention or arrest by Anaheim police officers in the city of Fullerton outside their territorial jurisdiction; that his confessions were obtained in violation of his rights under *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]; and *People* v. *Ireland,* 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580]; and that, in any event, his confessions were not knowingly and voluntarily made because he was in the throes of withdrawal from heroin use.

The court held a prolonged (one and one-half trial days) hearing on the admissibility of the confessions, at the conclusion of which it ruled that there was no unlawful detention or arrest and that the confessions were admissible, finding that beyond a reasonable doubt, as to all three confessions made by defendant, defendant was advised of his *Miranda* rights, that he knowingly and intelligently waived those rights; that his statements were voluntarily made and were not coerced or compelled in any way whatever or induced by any offers of reward.

The testimony adduced at the hearing may be summarized as follows. At 9:30 a.m. on August 22, 1969, Officer Willard A. Lowman and another officer, both of the Anaheim Police Department, went to an apartment in the city of Fullerton looking for one Duane Buttram. They had a warrant for Buttram's arrest and had been informed by another officer of their department that Buttram was at that location. When Officer Lowman arrived at the apartment he looked through a window and saw a man lying on a cot or mattress against the wall in the apartment. The officers knocked on the door but got no response. Then they went to the manager of the apartment and were told by her that the two female lessees of the apartment had stated to her that a strange man was in their apartment and that they would not spend the night there. The officers were given a key to the apartment by the manager. They returned to the door and again knocked on it, identifying themselves as police

officers. There was no response from the man on the cot. Using the key, the officers opened the door and entered. They approached the man on the cot and woke him.

The officers asked for identification and the man produced probation papers identifying himself as Mack Lyons, the defendant. The officers asked defendant if he knew Duane Buttram. He replied in the affirmative but stated he did not know Buttram's present whereabouts. Officer Lowman then called the Fullerton Police Department because defendant apparently did not belong in the apartment. Officer Lowman testified that he was not about to arrest defendant himself for trespassing but, on the other hand, that he would not have permitted defendant to leave pending the arrival of the Fullerton police. He was detaining defendant for arrest by Fullerton police.

During the time Officer Lowman observed defendant he appeared to be sleepy, but there was nothing unusual about the way he walked or stood and he exhibited no symptoms of being sick.

Responding to the telephone call of Officer Lowman, Officer Matthews of the Fullerton Police Department arrived at the apartment. Officer Lowman informed him of the conversation with defendant and of the conversation with the manager indicating that defendant was not supposed to be in the apartment. Officer Matthews talked by telephone with Mr. Fernandez, whom he knew to be the owner of the building, and Mr. Fernandez told him that he had given no one permission to be in that apartment. Officer Matthews then returned to the apartment and told Officer Milligan, a fellow officer from the Fullerton Police Department who had arrived on the scene, of his telephone conversation with Mr. Fernandez; that defendant did not have permission to be in the apartment and that it was Mr. Fernandez' desire that defendant be arrested for trespassing.

Officer Matthews testified that he observed defendant and noticed nothing unusual about his speech or manner of standing.

Officer Milligan then arrested defendant for violation of Penal Code section 647, subdivision (i) (taking up lodging in a residence without the owner's permission) and explained the charges to defendant. He then advised defendant of his *Miranda* rights. Defendant said that he did not want to talk about the charge. The time was then approximately 10:30 a.m. Following the arrest, Officer Milligan transported defendant to the Fullerton police station. At that time, Officer Milligan had no knowledge that defendant was wanted anywhere for armed robbery.

Officer Milligan stated that he observed the defendant and that he

checked defendant's eyes for any sign of either intoxication or drugs by means of a pupillary reaction test using a flashlight; that he noted no sign that defendant was under the influence of either narcotics or drugs; that defendant's conduct was not unusual and there was nothing unusual about his walk or speech.

At about 12:45 p.m., approximately two hours after defendant's arrest, Officer Hummitsch and Detective Baca of the Fullerton Police Department saw defendant in the interview room of the Fullerton Police Department jail for the purpose of interviewing him with respect to several armed robberies, including the robbery involved in the case at bench. The officers did not know that defendant had previously been advised of his *Miranda* rights nor that he had declined to talk about the Penal Code section 647, subdivision (i) charges. Officer Hummitsch advised defendant that he had information indicating that defendant had been involved in a number of Orange County robberies and that he was involved in a robbery in Garden Grove where he and another individual had been shot at upon leaving the store.[4] He read defendant his *Miranda* rights from a card and asked him if he understood these rights and whether he was willing to talk about the armed robbery charges. The defendant answered "Yes." Officer Hummitsch testified that he did not promise defendant any leniency if he would answer the questions or threaten or make any coercive gestures toward defendant.

Defendant stated to Officer Hummitsch and Detective Baca that he was involved in "probably three" robberies; that he had participated in the robbery of the liquor store in Garden Grove; and that he had been shot at during this robbery.

The interview lasted approximately 20 minutes. Officer Hummitsch noticed nothing unusual about defendant's physical condition. Defendant at no time complained about feeling ill or being ill. His responses to questions, according to the officers, were rational. Defendant did tell Hummitsch that he had a heroin habit; that he had been using heroin for a prolonged period of time; and had built up to approximately "two spoons" a day. He stated that the last time he had used heroin was about five days previously. Officer Hummitsch later passed on this information to Sergeant Sianez of the Garden Grove Police Department. Hummitsch testified that he had observed several hundred people under the influence of heroin and that defendant did not exhibit any of the characteristic symptoms of a person under the influence of heroin.

Later that afternoon, Detective Fischbeck transported defendant from

---

[4]The information concerning the liquor store robbery had been obtained by Officer Hummitsch the preceding day from an informant.

the Fullerton Police Department to the Garden Grove Police Department. Fischbeck had been advised by Sergeant Sianez that defendant might possibly be starting withdrawal from heroin use. He noticed defendant's "runny" nose. He asked defendant how he felt, and defendant replied that he felt all right. During the trip to the Garden Grove Police Department defendant said he was starting withdrawal and that he was having "dry heaves." Fischbeck observed defendant having slight "dry heaves." Defendant stated that he had had his last "fix" the morning of the previous day and asked if he could not be booked at the Orange County Hospital so that he could obtain medical aid. When they got to the Garden Grove Police Department, Detective Fischbeck saw defendant from time to time for a total of approximately 20 minutes. Defendant was given several cups of hot coffee, which, defendant stated, helped his stomach a little, and during that period of time, Fischbeck did not notice anything unusual about defendant's physical condition. At the Garden Grove Police Department defendant did not make any complaints of physical discomfort in Detective Fischbeck's presence.

At approximately 3:30 p.m. on the same day, Sergeant Mitchell Sianez of the Garden Grove Police Department saw defendant in his office. He gave defendant *Miranda* warnings. Defendant indicated that he understood his rights. When asked whether he wished to talk, he replied, "Yes, what's in it for me?" Sergeant Sianez testified that he replied that it would be up to the court to impose sentence and that he would inform the court of defendant's narcotics problem and that the court could take this into consideration. No mention, however, was made of the California Rehabilitation Center. Sergeant Sianez had been advised by Sergeant Hummitsch that defendant was previously advised of his *Miranda* rights and had waived his right to counsel.

Defendant admitted to Sergeant Sianez having been involved in the robbery of Bo-Jon's Liquor Store on July 27. He further stated that Robert Griffin and another person, whom he did not care to name, were involved in the robbery. Defendant informed the Sergeant that he held the gun on the proprietor and a female while his partner removed the money from the cash register; that they also held up a male customer who later entered the store; and that as they were running from the store, shots were fired at them.

The interview with Sergeant Sianez lasted approximately 15 minutes. At the outset, Sergeant Sianez asked defendant how he was feeling. Defendant replied that he was feeling "Okay," but that he had "felt better." He stated that he had some stomach discomfort but indicated that it was not bothering him at that time. He further indicated that he expected to

have more serious withdrawal symptoms, possibly later that evening, and he asked Sergeant Sianez to make some arrangements for medical treatment in the event he started going through "these bad withdrawals." Sergeant Sianez told defendant that about the only thing he could do would be to leave word with the jail that if defendant started having severe withdrawal symptoms it would meet with the department's approval for him to get medical treatment at the medical center or whatever treatment the nurse or physician at the jail would prescribe. Defendant was not promised, however, that he would be taken to the medical center. During the interview, defendant was not perspiring profusely and was not shaking. At one point, defendant felt that he might have to vomit, but when taken to the restroom he did not.

At about 4:30 p.m. the same day, defendant was finally interviewed by Investigator Brown of the Garden Grove Police Department. He was again advised of his constitutional rights; stated that he understood them and that he was willing to talk about the robbery. No promises were made to defendant, nor was he threatened. Defendant indicated that he robbed the Bo-Jon Liquor Store armed with a .45 caliber revolver. During this interview, defendant exhibited no indication of muscle cramps, perspiration or bloodshot eyes, nor did defendant complain of muscle cramps or any physical pain. Defendant's speech was normal and rational, and he appeared to understand the questions directed to him.

Katherine Montgomery, a registered nurse and medical deputy with the Orange County Sheriff's Department, testified that she saw defendant for about five minutes at about 9:40 p.m. the same day. Defendant appeared to be in some distress. He walked slowly. He complained of having chills, muscle cramps and vomiting. His speech was not slurred, however, nor did he seem to have any trouble understanding when she spoke to him. Mrs. Montgomery administered to defendant two benadryl capsules and, additionally, prescribed one capsule four times a day for three days.

In answer to a hypothetical question by the court, Doctor Anderson, a psychiatrist who had examined defendant in connection with his insanity plea and proceedings pursuant to Penal Code section 1368, stated his opinion that at the time of his interrogation, defendant had the ability to know the nature and quality of his acts and be in control of his faculties; that he could recall what he had done; that he could relate what he recalled and that he knew that he was confessing.

Defendant testified that he could not recall what he told Officer Hummitsch during his interrogation because he was sick at the time—he had stomach cramps and was nauseous. He further testified that during the interview with Sergeant Sianez his physical symptoms were becoming

more severe and painful than they had been in Fullerton and that he was led to believe by Sianez that the sooner he finished talking to the officers, the quicker he would get to the hospital. On the other hand, defendant admitted that he was not threatened and testified that he was aware, both at the Fullerton and Garden Grove police stations, that he had the right to remain silent.

## Unlawful Detention or Arrest

▮ Defendant's contention that all evidence of his confessions should have been suppressed because they were the product of an unlawful detention or arrest is without merit. Defendant argues here, as he did at the *in camera* hearing in the trial court, that the Anaheim police officers arrested him in the city of Fullerton, outside their territorial jurisdiction. Technically, the Anaheim police officers did not arrest defendant. The arrest for violation of Penal Code section 647, subdivision (i) was made by Officer Milligan of the Fullerton police after he had been called to the scene by Anaheim Police Officer Lowman. Officer Lowman did testify that he would have not permitted defendant to leave and that he was detaining defendant for arrest by the Fullerton police. Lowman's detention of defendant, however, was not unlawful, for, although he did not arrest defendant, he could have lawfully done so. ▮ "An officer's power of arrest, when acting beyond the limits of the geographical unit by which he is appointed, becomes that which is conferred upon a private citizen in the same circumstances." (*People* v. *Martin*, 225 Cal.App.2d 91, 94 [36 Cal.Rptr. 924]; *People* v. *Califano*, 5 Cal.App.3d 476, 484 [85 Cal.Rptr. 292].) "A private person may arrest another . . . [f]or a public offense committed or attempted in his presence." (Pen. Code, § 837, subd. 1.) ▮ Having observed defendant asleep on a cot in the apartment and having been informed by the manager of the apartment that the two female lessees would not spend the night there because a strange man was in the apartment, Officer Lowman would have been authorized to arrest defendant for a violation of Penal Code section 647, subdivision (i), declaring it a misdemeanor to lodge "in any building, structure or place, whether public or private, without the permission of the owner or person entitled to the possession or in control thereof."

▮ Even if there were some impropriety in defendant's detention or arrest, his confessions would not thereby have been rendered inadmissible. ▮ Although verbal statements as well as physical evidence that are the product of an illegal arrest are inadmissible under the exclusionary rule, all confessions following an unlawful arrest are not necessarily tainted. (*Wong Sun* v. *United States*, 371 U.S. 471, 487-491 [9 L.Ed.2d 441, 455-

458, 83 S.Ct. 407, 417-419]; *People* v. *Martin,* 240 Cal.App.2d 653, 656 [49 Cal.Rptr. 888]; cf. *People* v. *Bilderbach,* 62 Cal.2d 757, 762-768 [44 Cal.Rptr. 313, 401 P.2d 921].) As noted by the court in *People* v. *Bilderbach, supra:* " 'In the *Wong Sun* case the statements of Toy made simultaneously with the illegal arrest and the unsigned confession of Wong Sun made several days thereafter are at the opposite ends of the pole in considering the fruit of the poisonous tree. Between these two extremes there is a line, on one side of which the fruit is contaminated by the illegal arrest, and on the other side of which the taint has been dissipated. Where this line shall be drawn is a question of fact to be determined in each case.' (*United States* v. *McGavic* (1964) 337 F.2d 317, 319; . . .)" (62 Cal.2d at p. 768, fn. 6.) "[T]he test of voluntariness . . . remains a practical means for determining whether the connection between an illegal arrest and a confession has become so attenuated as to dissipate the taint or to overcome the 'reach of the fruits doctrine.' . . . 'If the individual confesses his offense because he wills to confess, his statement is the product of his own choice, not that of the illegal restraint.' " (*People* v. *Martin, supra,* 240 Cal.App.2d at p. 656.)

▮ The connection between defendant's detention by the Anaheim police and his subsequent confessions must be viewed as sufficiently attenuated to purge the taint of any possible illegality in defendant's detention. Defendant was detained and subsequently arrested for violation of Penal Code section 647, subdivision (i) [taking up lodging in a residence without the owner's permission]. He was advised pursuant to *Miranda* and declined to discuss that charge. So far as the record discloses, he never did discuss or confess his guilt of that offense. Approximately two hours after his arrest, however, after again being advised of his *Miranda* rights, defendant waived those rights; agreed to discuss the robbery charge; and confessed to that crime. He repeated his confession on two separate occasions later the same day at the Garden Grove police station. Defendant himself testified that he was not threatened and that he was aware, both at the Fullerton and Garden Grove police stations, that he had the right to remain silent. Under these circumstances it must be concluded that defendant's confessions were the product of his own will, not that of the illegal restraint. (Cf. *People* v. *Martin, supra,* 240 Cal.App.2d at p. 657.)

*Voluntariness of Confessions*

▮ Defendant's contention that his confessions were involuntary because he was undergoing withdrawal from heroin and because improper promises were made to him is not meritorious. The rules governing appellate review of this issue are distilled in *People* v. *Daniels,* 1 Cal.App.3d

367 [8 Cal.Rptr. 675]. **(7)** "On appeal, the trial judge's findings on the question of waiver of rights and voluntariness will not be set aside unless they are 'palpably erroneous.' [Citations.] It is not the function of the reviewing court to resolve conflicts in the evidence, to reweigh it, or to make an independent determination as to whether the prosecution has sustained its burden beyond a reasonable doubt. [Citations.] It is the duty of an appellate court, however, to make an independent examination of the uncontradicted evidence to determine whether a confession has been obtained in compliance with *Miranda* requirements and was voluntarily made. [Citations.] Those issues must be reviewed in light of the whole record and 'the totality of circumstances.' [Citations.]" (1 Cal. App.3d at pp. 374-375; see also *People* v. *Lara,* 67 Cal.2d 365, 392 [62 Cal.Rptr. 586, 432 P.2d 202].)

█ Aside from defendant's testimony, there is no evidence whatever that at the time he confessed to Officer Hummitsch and Detective Baca defendant was suffering withdrawal symptoms. Hummitsch testified that defendant did not complain of feeling ill or being ill and that his responses to questions were rational. There was evidence that, as the day drew on, defendant from time to time exhibited some mild symptoms associated with heroin withdrawal, but, except for the testimony of defendant himself, the evidence is overwhelming that defendant's discomfiture was mild and that he appeared to be able to understand questions put to him and responded rationally thereto. The information he gave was in accord with the account given by the victims. (Cf. *People* v. *Williams,* 8 Cal.App.3d 44, 51 [86 Cal. Rptr. 821]; *People* v. *Dacy,* 5 Cal.App.3d 216, 220 [85 Cal.Rptr. 57].)

The only evidence of any improper promises made to defendant was defendant's testimony that, during the interview with Sergeant Sianez, he was led to believe that the sooner he finished talking to the officers the quicker he would get to the hospital. Sergeant Sianez, however, testified that defendant was not promised that he would be taken to the hospital, and, on the contrary, was told that the only thing Sianez could do would be to leave word with the jail that if defendant started having severe withdrawal symptoms it would meet with the department's approval for him to get medical treatment.

Thus, as to these factual questions there was at most conflicting evidence, the resolution of which largely involved credibility, which the trial court resolved adversely to defendant. █ "[T]o the extent that the relevant evidence is in conflict, the resolution of the triers of fact below, which was made under correct rules of law, will not be disturbed on appeal." (*People* v. *Lara, supra,* 67 Cal.2d at p. 392; also *People* v. *Carter,* 7 Cal.App.3d 332, 336 [88 Cal.Rptr. 546].)

## The Miranda-Fioritto Problem

The third prong of defendant's attack upon the admissibility of his confessions is more difficult to resolve. His argument is that, having been advised of his *Miranda* rights upon his arrest for violation of Penal Code section 647, subdivision (i) and having declined to discuss that charge, it was violative of his constitutional rights for the police subsequently to re-advise him and to question him concerning the robbery charge. In *Miranda* v. *Arizona, supra,* 384 U.S. at pp. 473-474 [16 L.Ed.2d at p. 723, 86 S.Ct. at pp. 1627-1628] it is said: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." The California Supreme Court has strictly applied these principles, viewing the rule as one "that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions." (*People* v. *Fioritto, supra,* 68 Cal.2d at p. 717; *People* v. *Ireland, supra,* 70 Cal.2d at p. 535.)

We are of the view, however, that the rule stated was not intended to and does not apply to the fact situation presented by the case at bench. Literally, in the present case, defendant never declined to discuss the robbery charge. He was advised of his *Miranda* rights in connection with his arrest for violation of Penal Code section 647, subdivision (i) and declined to discuss that charge. There is no evidence whatever that his arrest on that charge was a subterfuge for holding him pending further investigation of the robbery charge. In fact, Officer Milligan who arrested defendant for violation of Penal Code section 647, subdivision (i) had no information that defendant was implicated in a robbery. Officer Hummitsch, who first discussed the robbery charge with defendant some two hours later, had no knowledge that defendant had previously been advised of his *Miranda* rights and refused to discuss the unlawful lodging charges. More importantly, Officer Hummitsch made no attempt to question defendant with respect to the charges he had declined to discuss. He simply asked defendant whether he was willing to discuss the completely separate robbery charge. After being again advised of his *Miranda* rights, and being aware, according to his own testimony, that he had the right to remain silent,

defendant indicated his willingness to discuss these separate charges and confessed.

We hold that, where a defendant is originally arrested on one charge, which he refuses to discuss, and the police then learn that he may be involved in a completely separate offense, and where the initial arrest was not a subterfuge for holding the defendant with respect to the separate offense and in the absence of coercive police tactics, the police with propriety may readvise the defendant of his *Miranda* rights and ask him whether he wishes to discuss the separate offense. The rule announced serves the interests of both efficient law enforcement and the accused. It is important to proper law enforcement that the police be able to ascertain at the earliest possible time whether their attention is being directed at the wrong person. This may be equally important to the suspect. He may be perfectly willing to discuss the subsequently discovered charges and may have an alibi or other defense which prompt inquiry can establish. (Cf. the rationale underlying in-the-field identifications in *People* v. *Floyd,* 1 Cal.3d 694, 714 [83 Cal.Rptr. 608, 464 P.2d 64]; *People* v. *Anthony,* 7 Cal.App.3d 751, 765 [86 Cal.Rptr. 767]; *People* v. *Irvin,* 264 Cal.App.2d 747, 759-760 [70 Cal.Rptr. 892].) If, of course, the defendant declines to discuss the separate charges or otherwise invokes his *Miranda* rights with respect thereto, any interrogation relating thereto must cease. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 473-474 [16 L.Ed.2d at pp. 722-723, 86 S.Ct. at pp. 1627-1628]; *People* v. *Fioritto, supra,* 68 Cal.2d at pp. 718-719; *People* v. *Ireland, supra,* 70 Cal.2d at pp. 535-536.)

### *Instruction of the Jury*

One of the instructions given the jury read:

"As in the case of count I (dealing with robbery), in the case of the crime charged in count II (dealing with burglary), defendant is not guilty unless you are convinced to the requisite degree that there did exist a union or joint operation of act or conduct and a certain specific intent.

"In order to prove the crime of burglary, as charged in count II of the information, there must have existed in the mind of the defendant, *when he entered the liquor store,* the specific intent to unlawfully steal and carry away the personal property of another of any value, or to commit a felony, and unless such intent so exists the crime is not committed." (Italics added.) Defendant contends that by this instruction the jury was improperly instructed that the defendant had in fact entered the liquor store. Although its language was not ideal, we do not agree that the instruction had the prejudicial effect attributed to it by defendant. It related solely to the necessity that, for defendant to be guilty of burglary, the jury must find that he en-

tered the store with the specific intent to commit a felony. That question could never arise unless it were assumed, *arguendo,* that defendant entered the liquor store. The jury was advised by other instructions that entry is an essential element of the crime of burglary; that the defendant was presumed to be innocent; and that the state had the burden of proving him guilty beyond a reasonable doubt. The jury was further instructed that it was not to single out any certain sentence, or any individual point or instruction, but was to consider all of the instructions as a whole and to regard each in the light of all the others. When viewed in the light of the other instructions the instruction given did not inform the jury that defendant in fact entered the store. Moreover, even if it had, such impropriety could hardly be classified as reversible error in view of defendant's confessions.

### *Motion for New Trial*

 Defendant's contention that the court erred in denying his motion for new trial is based upon the following circumstances. Initially, both Mr. Etchandy and Officer Lowery testified that Etchandy's identification of defendant in the jury box of Division 4 of the West Orange County Municipal Court occurred on August 29, 1969 and that on that same occasion Mr. Etchandy also identified as being present in the jury box the other robber, one Robert Griffin. Subsequently, defense counsel elicited testimony from the custodians of the jail records and the court records which indicated that defendant was not present in that court on August 29 but was present on August 26. Thereafter, Officer Lowery testified that the correct date of the day on which Mr. Etchandy made this pretrial identification must have been on August 26 rather than August 29. The testimony elicited by defense counsel, however, established that Robert Griffin was not present in that courtroom on August 26 and, in fact, that there was no day at or about August 26 or August 29 on which both defendant and Griffin were in court at the same time.

From this, defendant argues that ". . . the verdict was contrary to the evidence in that the identification of defendant was erroneous and . . . the officers' testimony . . . was conflicting." The trial court may, of course, grant a new trial when it appears that a verdict adverse to the defendant is contrary to the evidence. (Pen. Code, § 1181, subd. 6.) A motion for new trial is, however, addressed to the trial court's judicial discretion, and its action will not be disturbed on appeal unless that discretion is clearly and unmistakably abused. (*People* v. *Sarazzawski,* 27 Cal.2d 7, 15-16 [161 P.2d 934].) As previously noted, even if all of the testimony of Mr. Etchandy and Officer Lowery concerning defendant's pretrial identification by Mr. Etchandy were eliminated, defendant's confessions and the eyewitness identification testimony of Juanita Gruwell

constituted ample evidence to support the verdict. There was, therefore, no abuse of discretion in the trial court's denying the motion for new trial. (*People* v. *Lamb,* 204 Cal.App.2d 255, 266 [22 Cal.Rptr. 284].) Moreover, the uncertainty in the testimony concerning the date of Mr. Etchandy's pretrial identification of defendant and the evidence indicating that defendant and Robert Griffin were not in court at the same time constituted only a conflict in the evidence raising some question of the accuracy of the testimony of Mr. Etchandy and Officer Lowery in this respect. Officer Lowery testified that he was often in that particular court on official business and had been there several times during the week in question. He admitted that he had not made a notation of the date of the pretrial identification and had reconstructed the date from memory. The worst that could reasonably be inferred is that neither Mr. Etchandy nor Officer Lowery recalled the specific date and that, possibly, the person identified in the courtroom as Robert Griffin was not he. The identification of Griffin was a matter entirely collateral to the identification of defendant, and a review of the testimony of Mr. Etchandy and Officer Lowery is persuasive that these two witnesses did not create the story of defendant's pretrial identification out of whole cloth.

### Prosecutor Misconduct

██ After introduction of the defense testimony that the records indicated that defendant and Robert Griffin were not in the municipal court on the same day, in an attempt to produce evidence which would explain the apparent inconsistency resulting from the testimony of Officer Lowery and Mr. Etchandy that defendant and Griffin were in the courtroom at the same time, the prosecutor asked defendant: "Isn't it a fact that Mr. Griffin told you at that time that he had swapped booking sheets with someone else?" Defense counsel objected to the question in the absence of an offer of proof that the prosecutor had evidence to support asking it. Out of the presence of the jury, the district attorney admitted that he had no direct proof that Griffin had switched booking slips, but maintained that he was not guilty of misconduct because he could not believe that both Mr. Etchandy and Officer Lowery were lying and that, therefore, by process of elimination, there must have been tampering with the booking slips. Defense counsel then cited the question as misconduct and moved for a mistrial. The court denied the motion for mistrial, but informed the jury that he had sustained defendant's objection to the question and admonished the jury at length that it must disregard the question and not draw any inference therefrom. In addition, at the end of the trial, the jury was given a special instruction in which they were advised that the district attorney "knows of no evidence to support his asking this question in the form

asked" and by which they were again admonished to disregard the question and directed "not [to] draw any inference from it that the innuendo contained therein is a fact."

Any possible inference adverse to defendant was overcome by the trial court's prompt admonition and subsequent special instruction to the jury.

*The Insanity Plea*

Originally, defendant pleaded not guilty. Thereafter, in defendant's presence and in open court, defense counsel was permitted to change the plea to not guilty and not guilty by reason of insanity. Criminal proceedings were then suspended and proceedings instituted to determine defendant's present sanity pursuant to the provisions of Penal Code section 1368. Two physicians who were appointed by the court were requested to examine defendant and furnish their opinions not only as to his present sanity and ability to cooperate in his defense but, also, as to his sanity at the time of the alleged commission of the crime. Subseqently, at a proceeding on October 9, 1969, defense counsel offered to submit both matters, the present sanity and the insanity plea, on the doctors' reports. The court replied: "We have to take it up one point at a time." Thereafter, on the issue of present sanity, the court found that "defendant is sane and understands the charge against him and he is able to cooperate with his counsel." Some confusion ensued, as a result of which the insanity plea was not submitted on the reports of the doctors and no disposition was ever made thereof.

It is well established that, where an insanity plea is joined with a plea of not guilty, the trial and the verdict are not complete, and the court cannot impose a sentence after a verdict of guilty until and unless the insanity issue is first tried and the defendant found to be sane at the time the offenses were committed. It is irrelevant that the defendant may have failed to object to the entry of judgment before determination of his insanity plea. A sentence before both of such verdicts have been returned is void. (Pen. Code, § 1026; *People* v. *Marshall,* 99 Cal.App. 224, 227-228 [278 P. 258] (approved in *People* v. *Marshall,* 209 Cal. 540 [289 P. 629]); *People* v. *Leon,* 163 Cal.App.2d 791, 794 [329 P.2d 996]; *People* v. *Wilson,* 15 Cal.App.2d 172, 179 [59 P.2d 187].) It will be necessary, therefore, to remand the case to the trial court for trial of defendant's plea of not guilty by reason of insanity.

Inasmuch as the sentence must be vacated, it is unnecessary that we dispose of defendant's contention that the sentence imposed violated the prohibition of Penal Code section 654 against double punishment. It may be pertinent to note that the cited code section does not prohibit double conviction, only double punishment, and that its purposes may be satisfied

by the trial court's properly staying execution of sentence on the less serious offense. (*In re Wright,* 65 Cal.2d 650, 655-656, fn. 4 [56 Cal.Rptr. 110, 422 P.2d 998]; *People* v. *Cheffen,* 2 Cal.App.3d 638, 641-642 [82 Cal. Rptr. 658].)

The judgment is reversed and the cause remanded for trial upon the remaining issue of not guilty by reason of insanity. If defendant is found not guilty by reason of insanity, the court will then take proper steps in the premises. If he is found sane, the court will resentence him as provided by law. (*People* v. *Leon, supra,* 163 Cal.App.2d at p. 794.)

Kerrigan, Acting P. J., and Tamura, J., concurred.